Robert J. HERNDON and Sara
J. Herndon, Plaintiffs–
Respondents,

v.

Randy Lee TUHEY and Ann Janette
Tuhey, Defendants–Appellants.

No. 75184.

Supreme Court of Missouri,
En Banc.

June 29, 1993.

Mark E. Gardner, Springfield, for defendants-appellants.

Richard L. Schnake, Springfield, Larry W. Meyer, Aurora, for plaintiffs-respondents.

THOMAS, Judge.

Cody Christopher Tuhey, age ten, descended from strong, proud stock. Cody is the son of Ann and Randy Tuhey and the grandson of Ann's parents, Robert and Sara Herndon. A neutral observer might describe his parents and grandparents as resolute, strong-willed, tenacious and persevering. A different observer, equally neutral, might describe the same characteristics as obstinate, inflexible, unyielding, and even stubborn or hardheaded. The truth is that all of these terms may accurately describe the various parties at one time or another. These personalities and character traits have combined with a series of events and have caused the parents and grandparents to be alienated from each other and, more importantly, have resulted in Cody and his grandparents being isolated from each other. This unfortunate situation has culminated in this action brought by the grandparents against Cody's parents seeking visitation rights with Cody under section 452.402, RSMo Supp.1992. The conclusion we reach today demonstrates once again that the law is very inadequate when it comes to solving the

personal problems of an embattled family. We tender the warning that the very best remedy this Court could hope to provide is feeble indeed in comparison to the solution the parties would reach if they were successful in solving this problem by mutual agreement. Having acknowledged the inadequacy of the remedy the parties seek, we move on to consider the issues presented.

Ann and Randy Tuhey were married in December 1981. At that time, Randy had two other sons from a previous marriage. Cody Christopher Tuhey was born on November 24, 1982.

Randy and Ann Tuhey have lived in Marionville, Missouri, since their marriage in December 1981. Robert and Sara Herndon have always lived in Marionville, and their business, Herndon's Orchard, is located there. After the Tuheys married, Randy worked at Herndon's Orchard for eight years. In the last year and a half that Randy was employed at the orchard, the Herndons became dissatisfied with Randy's work. During this same period of time, Randy felt pressure and stress from what he viewed as consistently conflicting instructions from the Herndons. He felt that if he followed Mrs. Herndon's orders he was criticized by Mr. Herndon, and if he followed Mr. Herndon's orders, he was criticized by Mrs. Herndon. Although the Herndons did not find Randy's work to be satisfactory the last year and a half of his employment, Randy was never advised by the Herndons that his work was unacceptable. Indicative of the fact that communications between the Herndons and Randy were strained, when the Herndons decided to terminate Randy's employment in February of 1990, Mrs. Herndon told Ann to inform Randy that his employment at the orchard had been terminated.

The Tuhey's marriage began to deteriorate, and in May 1990 the two separated; Ann filed for dissolution of the marriage. During this separation Cody lived with his mother and visited his father. Prior to August 1990, the testimony before the trial court shows Cody had a close relationship with his grandparents. Cody spent a great deal of time with his grandparents at the orchard from preschool age and continued after he began attending elementary school. After school, Cody would get off the bus at the orchard, and his grandparents would care for him until either Randy or Ann would come to pick him up. There was considerable testimony that Cody would help his grandparents around the orchard, that his grandmother would take him to "story time" at the public library, that his grandfather coached Cody's basketball team, that his grandparents attended all of Cody's sporting events, that his grandmother taught Cody's Sunday school class, that the families would go on trips together, and that large family gatherings would occur on holidays.

An unfortunate incident occurred in August 1990 while Randy and Ann were still separated. Ann was living near the orchard, and Randy was living in a trailer in Marionville. On the date of this occurrence, Cody was scheduled to spend the weekend with his father, but Cody had indicated he did not wish to do so. Mrs. Herndon requested of Ann that Cody be left with the Herndons for the weekend. Ann explained the visitation arrangement and then took Cody to Randy's trailer. Later, Ann returned to the Herndons' house to pick up Cody's bicycle. At this time, Mrs. Herndon questioned Ann about taking Cody to Randy when he did not want to go; an argument ensued, with Mrs. Herndon uttering profanities about Randy. Ann then became angry, struck her mother, and left the premises. Mrs. Herndon returned to her house, was upset, and explained to Mr. Herndon what happened. Mr. Herndon became upset and decided to confront Randy. The Herndons drove to Randy's trailer at a high rate of speed and went onto the property uninvited. The evidence was conflicting as to what happened next. The court found that Ann and Mrs. Herndon engaged in a shoving match. There was a physical altercation between Mr. Herndon and Randy in which Mr. Herndon sustained a broken nose, and Randy suffered severe bruising to his chest. Since that occurrence in August 1990, the Tuheys have refused to allow the Herndons to have

visitation with Cody, and there has been no significant contact between Cody and his grandparents.

After the argument and physical altercation in August 1990, Randy and Ann reconciled, and the action for dissolution was dismissed. The Herndons and the Tuheys, however, did not reconcile, and three lawsuits concerning different disputes were instigated. In the first lawsuit filed, the Herndons sought to recover $16,000 plus interest from the Tuheys for a loan the Herndons made to the Tuheys approximately four years earlier for the purchase of a home. Prior to the filing of this lawsuit, the Herndons had not requested any payment of either principal or interest. The Herndons were aware that at the time they brought this suit the Tuheys were not financially able to pay off the loan. The trial court found that, while the Tuheys believed this suit was brought to bring pressure upon them, the Herndons were legally within their rights to protect their financial interest. The suit was compromised by a note secured by a deed of trust on the Tuhey's home.

In November 1990, the Tuheys filed the second lawsuit, a small claims action against the Herndons seeking the return of cattle that had been taken to the Herndons for breeding purposes. The court ruled for the Tuheys.

The last lawsuit was the petition in the present case by the Herndons seeking visitation with Cody under section 452.402. This petition was filed on February 4, 1991, in the Circuit Court of Lawrence County. The Tuheys denied all material allegations. In their answer, the Tuheys also challenged the constitutionality of section 452.402.

The trial court held that section 452.402 is not unconstitutional and made a specific finding that "visitation by [the Herndons] would be in Cody's best interest and such visitation would not endanger Cody's physical health or impair Cody's emotional development." The court ordered that the Herndons have visitation with Cody the first and third Saturday of each month from 9:00 a.m. until 6:00 p.m. This visitation was to commence as of November 16, 1992. The visitation schedule for these monthly visits was to be altered effective March 1993, so that the Herndons would have visitation on the first Saturday of each month from 9:00 a.m. until 6:00 p.m. and an overnight visitation on the third weekend of each month from 1:00 p.m. on Saturday until 6:00 p.m. Sunday. The trial court also ordered visitation for five hours either on Thanksgiving day or, at the option of the Tuheys, the Sunday following Thanksgiving. For Christmas, the grandparents are allowed visitation each December twenty-third from 5:00 p.m. until 10:00 p.m. The Herndons are also given visitation with two consecutive days including an overnight stay during Cody's Christmas vacation. During summer vacation the Herndons are given visitation for one week between June 15 and August 15 each year. In addition, the parents must notify the Herndons of all school, social, and athletic activities in which Cody is participating that grandparents would reasonably be expected to attend.

The Tuheys appealed the trial court's decision to the Court of Appeals, Southern District. The court of appeals transferred the case to this Court by reason of the constitutional issue. Three issues are presented on appeal. First, whether section 452.402 is unconstitutional because it violates the First and Fourteenth Amendments of the United States Constitution. Second, if section 452.402 is constitutional, whether the visitation granted in this case was excessive. Third, if section 452.402 is constitutional, whether the trial court erred in allowing visitation in this case because the evidence shows that compulsory grandparent visitation would have a negative impact on the emotional and psychological development of Cody.

■ The primary question presented in this case is whether the following subsections of section 452.402 are constitutional:

1. The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary orders to enforce the decree. The court may grant grandparent visitation when:

\* \* \* \* \* \*

(3) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days.

2. The court shall determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair his emotional development. Visitation may only be ordered when the court finds such visitation to be in the best interests of the child. The court may order reasonable conditions or restrictions on grandparent visitation.

452.402, RSMo Supp.1992.

■ We must begin our analysis with the presumption that a statute is constitutional. In addition, only if the statute clearly contravenes a constitutional provision will it be found unconstitutional. *State v. Stokely,* 842 S.W.2d 77 (Mo. banc 1992); *Blaske v. Smith & Entzeroth, Inc.,* 821 S.W.2d 822, 828 (Mo. banc 1991); *State v. Young,* 695 S.W.2d 882 (Mo. banc 1985). A statute must be interpreted to be consistent with the constitution of the United States if it is at all possible. *Young,* 695 S.W.2d at 885; *State Highway Comm'n v. Spainhower,* 504 S.W.2d 121, 125 (Mo. 1973). Furthermore, any doubts concerning the constitutionality of a statute will be resolved in favor of validity. *Young,* 695 S.W.2d at 883; *State ex rel. McClellan v. Godfrey,* 519 S.W.2d 4, 8 (Mo.1975).

The Tuheys contend that they have a basic constitutional right to raise their children as they see fit, free from state intrusion absent a showing of harm to the child. It is true that the United States Supreme Court has found certain rights related to marriage, family relationships, child rearing and education of children to be an area protected by the United States Constitution. In *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977) (quoting *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 639–40, 94 S.Ct. 791, 796, 39 L.Ed.2d 52 (1974)), the Court stated: "This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."

■ Of course, this Constitutional right is not absolute. The cases demonstrate many circumstances in which state regulation is proper and not unconstitutional because it is an area that has traditionally been reserved to the states. *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) ("[t]he wellbeing of its children is a subject within the State's constitutional power to regulate"). In *Prince v. Massachusetts,* 321 U.S. 158, 166–67, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944), the Court recognized that a state "has a wide range of power for limiting parental freedom" and "may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways."

The Tuheys rely on the following cases in which a state statute was held to be unconstitutional: *Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599 (1982) (complete termination of parental rights requires due process hearing); *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (ordinance limiting occupancy of a dwelling unit to a single family unconstitutional because the ordinance allowed only narrowly defined family patterns; strong tradition and recognition of the extended family and a family may define itself); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 1212, 31 L.Ed.2d 551 (1972) (Illinois statute that automatically terminated an unwed father's rights to his children when the mother died was unconstitutional; father entitled to a hearing on his fitness); *Wisconsin v. Yoder,* 406 U.S. 205, 232–33, 92 S.Ct. 1526, 1541–42, 32 L.Ed.2d 15 (1972) (Wisconsin could not require Amish children to attend school after eighth grade because further education with teachers who are not Amish interposes a serious barrier to the integration of the child into the Amish religious community); *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925) (statute that required children to attend state primary schools held unconstitutional because un-

reasonably interfered with rights of parents and guardians to direct the upbringing and education of children under their control; parents can choose schools where their children will receive appropriate mental and religious training); *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) (statute prohibiting teaching of any language except English until after the eighth grade unconstitutional because it "is arbitrary and without any reasonable relationship to an end within the competency of the State").

Additional cases relied upon by the Tuheys in which the statute was upheld in the face of a constitutional attack include: *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978) (statute held constitutional that allowed the adoption of an illegitimate child without requiring the consent of the noncustodial biological father where the adoption is found to be in the best interest of the child); *Ginsberg v. New York,* 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968) (statute prohibiting sale of obscene materials to minors under seventeen years of age was not unconstitutional because it had a rational relationship to the safeguarding of its minors); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944) (child labor laws prohibiting female children under the age of 18 years from selling magazines and periodicals are constitutional even though it was applied to children who were Jehovah's Witnesses selling "Watchtower" and "Consolation" as part of their religious beliefs).

■ We hold that subsections 452.402.-1(3) and 452.402.2 are constitutional. Even given the fact that the parents have a constitutional right to make decisions affecting the family, the magnitude of the infringement by the state is a significant consideration in determining whether a statute will be struck down as unconstitutional. In *Zablocki v. Redhail,* 434 U.S. 374, 375, 98 S.Ct. 673, 675, 54 L.Ed.2d 618 (1978), the United States Supreme Court was considering a Wisconsin statute prohibiting marriage by any resident who was required to pay child support without a prior judicial determination that child support has been paid and that the minors "are not then and are not likely thereafter to become public charges." Concerning the magnitude of the infringement that is required to render the statute unconstitutional, the Court stated:

By reaffirming the fundamental character of the right to marry, we do not mean to suggest that every state regulation which relates in any way to the incidents of or prerequisites for marriage must be subjected to rigorous scrutiny. To the contrary, reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship may legitimately be imposed.

*Zablocki,* 434 U.S. at 386, 98 S.Ct. at 681.

The importance of the extent of the infringement in a fundamental rights analysis has been recently reiterated by Justice O'Connor in the abortion cases. Dissenting in *Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), *overruled by, Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), Justice O'Connor stated:

[N]ot every regulation that the State imposes must be measured against the State's compelling interests and examined with strict scrutiny.... The Court and its individual Justices have repeatedly utilized the "unduly burdensome" standard in abortion cases.

The requirement that state interference "infringe substantially" or "heavily burden" a right before heightened scrutiny is applied is not novel in our fundamental-rights jurisprudence, or restricted to the abortion context. In *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 37–38[, 93 S.Ct. 1278, 1299, 36 L.Ed.2d 16] (1973), we observed that we apply "strict judicial scrutiny" only when legislation may be said to have " 'deprived,' 'infringed,' or 'interfered' with the free exercise of some such fundamental right or personal liberty." If the impact of the regulation does

not rise to the level appropriate for our strict scrutiny, then our inquiry is limited to whether the state law bears "some rational relationship to legitimate state purposes." (Citation omitted.) Even in the First Amendment context, we have required in some circumstances that state laws "infringe substantially" on protected conduct, *Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539, 545[, 83 S.Ct. 889, 893, 9 L.Ed.2d 929] (1963), or that there be "a significant encroachment upon personal liberty," *Bates v. City of Little Rock*, 361 U.S. 516, 524[, 80 S.Ct. 412, 417, 4 L.Ed.2d 480] (1960).

*Akron*, 462 U.S. at 461–63, 103 S.Ct. at 2509–10. *See also Planned Parenthood of Southeastern Pennsylvania v. Casey*, —— U.S. ——, 112 S.Ct. 2791 (plurality opinion written by Justice O'Connor in which Justice Kennedy and Justice Souter joined in Justice O'Connor's entire opinion); *Webster v. Reproductive Health Services*, 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (O'Connor concurring in part and concurring in the judgment).

 Even a casual comparison of the visitation rights contemplated for grandparents under section 452.402 (and particularly with regard to the limited rights we approve hereinafter) with the magnitude of the infringement in the cases relied upon by the Tuheys demonstrates that no constitutional violation is present in subsections 452.402.1(3) or 452.402.2. The case precedent relied on by the Tuheys encompass complete and permanent termination of parental rights (*Santosky* and *Stanley*), decisions concerning what schools children are to attend (*Yoder* and *Pierce*), prohibition on teaching certain foreign languages in any schools, public or private, to children who had not yet completed the eighth grade (*Meyer*), and complete housing occupancy prohibitions based on an unacceptably narrow definition of family (*Moore*). Unlike these significant infringements, visitation rights by grandparents as defined by subsections 452.402.1(3) and 452.402.2 are less than substantial encroachment on a family. Subsections 452.402.1(3) and 452.-402.2 contemplate occasional, temporary visitation, which may only be allowed if a trial court finds visitation to be in the best interest of the child and does not endanger the child's physical or emotional development. Moreover, the grandparents are members of the extended family whom society has traditionally recognized as playing an important role in the raising of their grandchildren.

The Kentucky Supreme Court recently upheld a statute similar to the Missouri statute under similar facts and circumstances to this case in *King v. King*, 828 S.W.2d 630 (Ky.), *cert. denied*, —— U.S. ——, 113 S.Ct. 378, 121 L.Ed.2d 289 (1992). In deciding this issue, the Kentucky Court stated:

In an era in which society has seen a general disintegration of the family, it is not unreasonable for the General Assembly to attempt to strengthen familial bonds. As this Court observed in *Hicks* [*v. Enlow*, Ky., 764 S.W.2d 68 (1989)] *supra*, "the grandparents' visitation statute was an appropriate response to the change in the demographics of domestic relations, mirrored by the dramatic increase in the divorce rate and in the number of children born to unmarried parents, and the increasing independence and alienation within the extended family inherent in a mobile society." (Citation omitted.) There is no reason a petty dispute between a father and a son should be allowed to deprive a grandparent and grandchild of the unique relationship that ordinarily exists between those individuals. One of the main purposes of the statute is to prevent a family quarrel of little significance to disrupt a relationship which should be encouraged rather than destroyed.

As noted in *Meyer, supra*, "The established doctrine is that liberty may not be interfered with under the guise of protecting the public interest by legislative action which is arbitrary or without reasonable relation to some purpose within the competence of the state to effect." (Citation omitted.) However, it is not unreasonable for the state to say that the development of a loving relationship

between family members is desirable and the arbitrariness of the statute is obviated by the requirement that visitation be granted by a court only after finding that it is in the best interest of the child.

\* \* \* \* \* \*

[T]he General Assembly determined that, in modern day society, it was essential that some semblance of family and generational contact be preserved. If a grandparent is physically, mentally, and morally fit, then a grandchild will ordinarily benefit from contact with the grandparent. That grandparents and grandchildren normally have a special bond cannot be denied. Each benefits from contact with the other. The child can learn respect, a sense of responsibility and love. The grandparent can be invigorated by exposure to youth, can gain an insight into our changing society, and can avoid the loneliness which is so often a part of an aging parent's life. These considerations by the state do not go too far in intruding into the fundamental rights of the parents.

*King*, 828 S.W.2d at 632. We agree that these are appropriate grounds for upholding a grandparent visitation statute. All of the considerations discussed by the Kentucky Court in support of their statute are equally applicable to support the Missouri statute.

■ In *Hawk v. Hawk*, 855 S.W.2d 573 (Tenn.1993), the Supreme Court of Tennessee held that Tennessee's grandparent visitation statute was unconstitutional under the Tennessee Constitution; the Court did not decide whether the statute is constitutional under the United States Constitution. The Tennessee Constitution acknowledges a right of privacy which encompasses the fundamental right of parents to raise their children as they see fit, and the Court held that unless substantial harm threatens a child's welfare the state cannot intervene without a sufficiently compelling justification. Therefore, under Tennessee's law the state may not interfere in any parental decision that may adversely affect a child unless the parent's action "substantially

endanger[s] the welfare of their children." *Hawk*, 855 S.W.2d at 582.

■ We do not believe that this same standard applies under the federal constitution unless there is a substantial infringement by the state on a family relationship. Missouri's statute is reasonable both because it contemplates only a minimal intrusion on the family relationship and because it is narrowly tailored to adequately protect the interests of parents and children. The statute provides that a court may grant visitation to a grandparent only if the grandparent has been unreasonably denied visitation for more than ninety days. A court may grant visitation only if it will be in the best interest of the child. If visitation would endanger the child physically, mentally, or emotionally then visitation must be denied. Furthermore, the ninety-day period of unreasonable denial of visitation that must elapse before a court may enter an order under section 452.402 indicates the legislature contemplated an allowance of minimal visitation subject to reasonable restrictions and conditions as a court might find appropriate. The judicial oversight section 452.402 provides adequately protects the integrity of a family and ensures the best interest of a child is being served. For all of the foregoing reasons we hold subsections 452.402.1(3) and 452.402.2 are constitutional.

■ The Tuheys next assert that the visitation granted in this case is excessive. We agree. We interpret the language of section 452.402, which requires as a prerequisite to ordering visitation an unreasonable denial of visitation for ninety days, to mean that visitation is to be much more limited than what was granted by the trial judge here. Because the legislature set ninety days as a precondition, this is an indication to the courts that visitation should not be excessive, should not be on a par with parental visitation in custody matters, and should not necessarily be commensurate with the contact between the grandparents and grandchild prior to the deterioration of relations between the parties. Our interpretation is based in part on the fact that if the statute allowed a great

amount of visitation we would be more likely to find an undue burden on the family and hold that these subsections are unconstitutional. Furthermore, we presume that the purpose of the legislature in enacting section 452.402 was to ensure some contact between grandparents and grandchildren but also to encourage families to work out their own problems without a great amount of governmental intrusion. Therefore, we reverse and remand to the trial court for a reassessment of the visitation granted in this case.

The final argument that the Tuheys present is that the trial court erred in allowing visitation because the evidence shows that compulsory grandparent visitation would have a negative impact on the emotional and psychological development of Cody. An appellate court will only set aside the judgment of a trial court if there is "a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Having reviewed the evidence, we defer to the trial court's finding that grandparent visitation is in the best interest of Cody and would not endanger Cody's physical health or impair his emotional development.

We affirm the judgment in part and reverse in part, and the case is remanded to the trial court for a reassessment of visitation in accordance with this opinion.

ROBERTSON, C.J., and HOLSTEIN, BENTON and PRICE, JJ., concur.

COVINGTON, J., dissents in separate opinion filed.

LIMBAUGH, J., concurs in opinion of COVINGTON, J.

COVINGTON, Judge, dissenting.

I respectfully dissent. The majority opinion's holding rests in actuality upon a trial court's discretion, rather than upon traditional principles of constitutional analysis. Under the majority's reasoning, the amount of visitation awarded by the trial court dictates whether or not the statute is constitutional. This is not a rule by which this Court should order its decisional process on questions of constitutionality.

As the majority concedes, autonomy in family decision making with respect to child rearing is one of the fundamental liberty interests protected by the due process clause of the fourteenth amendment. *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35, 45 S.Ct. 571, 573–74, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923). Traditionally, governmental intrusions on a fundamental liberty interest have been reviewed with strict scrutiny to determine whether the governmental intrusion is constitutional. *See Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 727–28, 35 L.Ed.2d 147 (1973); *see also Aptheker v. Secretary of State*, 378 U.S. 500, 508–09, 84 S.Ct. 1659, 1664–65, 12 L.Ed.2d 992 (1964). At least one case not within the context of reproductive rights has applied a strict or "heightened" scrutiny test in analyzing state intrusions into family autonomy. *Moore v. City of East Cleveland*, 431 U.S. 494, 499–502, 97 S.Ct. 1932, 1935–37, 52 L.Ed.2d 531 (1977). To pass strict scrutiny review, a governmental intrusion must be justified by a "compelling state interest" and must be narrowly drawn to express the compelling state interest at stake. *Roe*, 410 U.S. at 155, 93 S.Ct. at 727–28.

Section 452.402.2, RSMo Supp.1992, allows the trial court to order visitation when it is in the "best interests" of the child. The trial court may award visitation not only in cases where the evidence would require a finding that grandparent visitation was necessary to prevent harm from occurring to the grandchild, but also when the trial court finds that such visitation is beneficial to the child. A best interest test standing alone does not justify intrusion into the parents' constitutionally protected right of autonomy in child rearing. Generally, some showing of harm to the child is required. *See Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *see also Morrison v. State*, 252 S.W.2d 97, 100 (Mo.App.1952). Under strict scrutiny review, § 452.402.2 is highly suspect.

The majority opinion avoids strict scrutiny by its application of the "undue burden"

**212**

test articulated in the plurality decision of *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2820–21, 120 L.Ed.2d 674 (1992). Under this test, initially articulated by Justice O'Connor in *Akron v. Akron Center for Reproductive Health,* 462 U.S. 416, 461–63, 103 S.Ct. 2481, 2508–10, 76 L.Ed.2d 687 (1983) (O'Connor, J., dissenting), *overruled by Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2823, 120 L.Ed.2d 674 (1992), the state's intrusion into the fundamental liberty interest must "infringe substantially" or "heavily burden" that liberty interest before the strict scrutiny test will be applied. *Akron,* 462 U.S. at 461–63, 103 S.Ct. at 2508–10. In essence the majority holds that forcing an intact family to allow grandparents to visit the grandchild is an insignificant encroachment on family autonomy because § 452.402.2 contemplates only occasional, temporary visitation by a grandparent if it is in the best interests of the child.

Assuming that the "undue burden" test is the proper standard of review when the government intrudes into protected rights, the intrusion in the present case is far from insignificant. Allowing the government to force upon an unwilling family a third party, even when the third party happens to be a grandparent, is a significant intrusion into the integral family unit. The principal opinion acknowledges the significance of the intrusion by noting that "if the statute allowed a great amount of visitation we would be more likely to find an undue burden on the family and hold that these subsections are unconstitutional." Maj. at 210.

A rule to determine constitutionality that is grounded in a reviewing court's finding a proper exercise of trial court discretion is neither principled in the context of analysis of a constitutional challenge, nor is it workable. A statute is either constitutional, or it is not. Section 452.402.2 intrudes upon the parents' fundamental liberty interest in family autonomy in child rearing. The statute does so in a broad fashion, provid-

ing only a best interests test. It is without cavil that most children benefit from a relationship with grandparents. Before a family decision with respect to child rearing is intruded upon, however, the legislature should, at a minimum, require a showing of harm to the child in the absence of visitation. For today, however, it is unnecessary further to argue that § 452.402.2 is not sufficiently narrowly drawn to express any compelling state interest that might arguably be at stake. It is enough simply to make clear that the majority opinion is insupportable in terms of traditional principles of constitutional analysis.