Dixie SIMPSON, Appellant,

v.

William BUCK and Alisa Buck, Respondent.

No. WD 54274.

Missouri Court of Appeals, Western District.

June 30, 1998.

Mark A. Richardson, Neff & Richardson, Jefferson City, for appellant.

Marcus G. Reed, Clinton, for respondent.

Before HANNA, P.J., and BRECKENRIDGE and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Appellant Dixie Simpson appeals from the trial court's judgment entered April 15, 1997, establishing her rights to grandparent visitation pursuant to Section 452.402 RSMo 1997.

Mrs. Simpson claims the trial court committed error in ordering her to exercise at least one supervised visit in Ohio as a precondition to any unsupervised visitation in Missouri because the condition was not a reasonable restriction or condition on grandparent visitation under the statute. Mrs. Simpson also claims the trial court erred in denying her motion for contempt because it was against the weight of the evidence in that the evidence showed that respondents, William and Alisa Buck, although aware of the Order allowing grandparent visitation, willfully and contumaciously disobeyed it and moved to the state of Ohio without giving proper notice to the court or to her. For the reasons explained below, we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The record shows that Mrs. Simpson's grandson, Caide Buck, visited her at her home in August 1995, but had never been permitted to do so thereafter. She visited him in the home of his parents, the Bucks, in Jefferson City, Missouri sometime in September 1995, and had one short visit with him in 1996. For reasons she did not fully understand, the Bucks did not allow her to visit with him thereafter. Frustrated with what she believed to be undue limitations on her contact with her grandson, Mrs. Simpson filed a Petition for Grandparent Visitation in the Circuit Court of Cole County, Missouri on January 29, 1996.

After extensive negotiations, the parties reached an agreement about grandparent visitation which was read into the record by the Guardian Ad Litem at a hearing held on August 28, 1996. The agreement provided that:

In the first year after the date of the Decree signed and Settlement approved, there will be six visits allowed to petitioner. Two of these will occur in Springfield and four of these will occur in the Jefferson City area. Of the two in Springfield, one will occur on or around Christmas of this year and one will occur in the summer

of 1997. With regard to the four other visitations, those will be weekends agreed upon by the parties with default weekends being specified in the settlement documents. And those weekends will be worked out between the parties and their attorneys.

In the second year,[1] while the parties are visiting in Springfield during the first year, Dixie will be allowed to—or will have the itinerary of activities set down there, with the Bucks being invited to participate or not to participate as the Bucks decide. On Saturday and Sunday of each of those weekends, Dixie will be allowed two hours of time with Caide alone without Mr. or Mrs. Buck present, to engage in whatever activities she'd like to do.

The second year, the provisions will be the same, except that the Bucks will not go down to Springfield for the Springfield visits, and Caide will be down there by himself. With regard to the Jefferson City area visitations, on the second year, Dixie will have—or Dixie and her husband, Gene, will come up and spend the night in a hotel and they will be allowed to have Caide over night in the hotel room with them. The visitation will not be limited to the Jefferson City city limits, and that they can take him to Columbia or Windsor or wherever they deem fit. They will just keep the Bucks informed of their plans. On a third year, and thereafter, there will be one week of visitation in Springfield during the summer, and there will be four weekend visits in Springfield. Those weekends will not include the Bucks, and those weekends will be decided by the parties with default weekends being specified in the settlement documents. Identical provisions will be allowed for Mac Powell.

The Guardian Ad Litem indicated that as soon as the settlement documents were prepared the Judge would sign the decree and it would be in effect. This statement was agreed to by all parties and their respective attorneys. The parties had not signed the

1. Although read into the record as the second year, this reference intended to refer to the first year.

agreement as of November 1, 1996. Nevertheless, on that date, the trial court signed an order which set out terms for grandparent visitation. For reasons not made clear by the record, that order was not consistent with the terms agreed to the prior August.

Of particular noteworthiness is the fact that the August agreement, as all parties were aware, provided that Mrs. Simpson would give the Bucks two weeks notice before visiting, and that the visitation would be supervised. The November 1, 1996 order presented to the court for signature, however, provided for unsupervised visitation on November 8, 1996, just one week later.

After obtaining a copy of the November 1, 1996, Judgment and Order, Mrs. Simpson had her husband, Gene, fax the Bucks notice she would be in Jefferson City on November 8, 1996, to visit her grandson, as provided for in the November 8, 1996 order. According to Mr. Simpson's testimony, he was then contacted by William Buck, who informed him that there would be no visit under the order because "he hadn't signed anything and he didn't care who had signed it." Mrs. Simpson traveled to Jefferson City, nonetheless, and found that the Bucks had moved out of their home in Jefferson City, and had listed it for sale. According to Mrs. Simpson's testimony, she located Alisa Buck in Jefferson City and contacted her by phone to request to see her grandson that weekend. She says Mrs. Buck responded: "Thank you for calling. That won't work out this weekend. We'll have to talk later. Goodbye."

Because the Bucks moved and denied her the November 8, 1996 visitation required by the November 1, 1996 order, Mrs. Simpson filed a Motion for Contempt and a Petition for Issuance of a Writ of Habeas Corpus. It was issued by the court and served on the Bucks in Ohio. On January 16, 1997, the court held a hearing on all pending motions, including the motion for contempt and the parties' motion to amend the November 1, 1996 judgment. Mr. Buck claimed that he had not been served with notice of the court's November 1, 1998 order prior to the November 8, 1996 visitation date. He also testified

that he had personally informed the Guardian Ad Litem about his move to Ohio and the Bucks' attorney had informed the Guardian Ad Litem about the potential move to either St. Joseph, Missouri, or Ohio sometime shortly after August 28, 1996.

All parties conceded that the move to Ohio rendered the court's previous order unworkable, and that a new order would need to be entered. Mr. Buck testified that he agreed that it would be in his son's best interests to have a relationship with Mrs. Simpson and that the court should set out some visitation for her with the boy. He further stated that he could drive to Missouri for some of the visits and that he would come back to Missouri for a July 4th and Thanksgiving visit. Mr. Buck indicated that any visits should be supervised because his son did not know Mrs. Simpson.

The trial court entered a new order which granted Mrs. Simpson "grandparent's visitation rights with the minor child Caide Buck in the State of Ohio at the home of his parents from Friday at 6:00 p.m. to Sunday at 6:00 p.m. once every two months."[2] The trial court further ordered that after Mrs. Simpson had completed at least one Ohio visit, she would be allowed unsupervised visitation with Caide for two days from 9:00 a.m. on the first day to 8:00 p.m. on the second day once during the month of July each year and once between November 1 and January 1 each year in the State of Missouri. "If Petitioner Dixie Simpson does not exercise at least one supervised Ohio visitation as ordered above, she shall not be entitled to any unsupervised visitation in Missouri." Mrs. Simpson appeals.

## II. STANDARD OF REVIEW

■ In matters pertaining to visitation rights, this Court gives deference to the trial court's assessment of what serves the best interests of the child and that judgment will not be disturbed on appeal unless the judgment is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies

2. Mr. Powell, as the minor child's grandfather, was given visitation rights in the court's April 15,

1997 order similar to those of Mrs. Simpson. He has not appealed any part of that order.

the law. *Shoemaker v. Shoemaker,* 812 S.W.2d 250, 253 (1991); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). The trial court's decision is presumed correct, and the appellant has the burden of showing error. *Kerr v. Jennings,* 886 S.W.2d 117, 123 (Mo. App.1994).

### III. LEGAL ANALYSIS

#### A. The Supervised Visit in Ohio.

■ Mrs. Simpson urges this Court to reverse the portion of the judgment requiring, as a precondition to any unsupervised visits in Missouri, that she go to Ohio and stay in the Bucks' home from Friday at 6:00 p.m. to Sunday at 6:00 p.m. Mrs. Simpson argues that the trial court lacks authority to order a grandparent to stay in the home of the grandchild for a weekend in another state as a precondition to visitation that everyone agrees is in the best interests of the child.

Missouri statutes provide, in pertinent part:

1. The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary orders to enforce the decree. The court may grant grandparent visitation when ... (3) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days.

2. The court shall determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair his emotional development. Visitation may only be ordered when the court finds such visitation to be in the best interests of the child. The court may order reasonable conditions or restrictions on grandparent visitation.

§ 452.402, RSMo 1997 (emphasis added).

The Missouri Supreme Court upheld the constitutionality of Section 452.402 in *Herndon v. Tuhey,* 857 S.W.2d 203 (Mo. banc 1993). The statute was upheld both because it contemplated only a minimal intrusion into family relationships and because it was narrowly tailored to protect the interests of both parents and children. Grandparents are members of the extended family and society recognizes the important relationship between children and grandparents. In furtherance of this goal, the legislature adopted Section 452.402, which contemplates occasional, temporary visitation by grandparents when found to be in the best interests of the child. *Herndon,* 857 S.W.2d. at 209.

■ The rights extended to grandparents, however, are not without limitation:

Because the legislature set ninety days as a precondition, this is an indication to the courts that visitation should not be excessive, should not be on a par with parental visitation in custody matters, and should not necessarily be commensurate with the contact between the grandparents and grandchild prior to the deterioration of relations between the parties.

*Herndon,* 857 S.W.2d at 210. The court has broad discretion in determining what limitations and terms are appropriate in the particular case. *Division of Family Services v. Ellis,* 870 S.W.2d 463 (Mo.App.1994); *Harris v. Harris,* 685 S.W.2d 242, 244 (Mo.App. 1985). Nothing in the statute or prior case law requires that the visits be in the grandparent's home or home state. Indeed, in *Komosa v. Komosa,* 939 S.W.2d 479 (Mo. App.1997), the Eastern District of this Court approved, on the particular facts before it, a limitation of grandparent visitation to once every 90 days in Colorado, the state to which the parents had moved.

Of course, other facts may well require more frequent or flexible terms of visitation. Here, the trial court's order permits Mrs. Simpson to see Caide every two months in Ohio, and also provides for twice-yearly visits in Missouri. We do not find the amount of visitation permitted to be unreasonable. Neither do we agree with Mrs. Simpson that the judgment is unreasonable in requiring that her first visit with her grandson occur in the Bucks' home in Ohio. The judgment does not, as suggested by Mrs. Simpson, require Mrs. Simpson to herself stay at the Bucks' home during the weekend she has visitation in Ohio. The only requirement is that her visits with the minor occur in the Bucks' home. When not visiting the child, Mrs.

Simpson can obviously stay in a hotel or wherever she desires.

The requirement that this first visit be in the Bucks' home and that it be supervised is not unreasonable. The trial court heard testimony that the Bucks were concerned about the child's care during Caide's overnight visit with Mrs. Simpson in September 1995. The trial court was also aware of the limited contact Caide had with his grandmother over the past several years, and that because of this limited contact Caide's parents felt it would be preferable if initial visits were supervised by Caide's parents. Finally, the trial court had before it a record which indicated the parties had previously implicitly agreed through settlement that most of the visitations for the first year would be supervised. The trial court had adequate evidence to require an initial visit to occur in the Bucks' home in Ohio before unsupervised visitations were allowed in Missouri, even if Mrs. Simpson would prefer not being required to visit Ohio because of her bad relationship with the Bucks.[3] The issue is *Caide's* best interests, and in light of the evidence before it, the trial court's restrictions were not unreasonable. For these reasons, the trial court's judgment as to this issue is affirmed.

### B. Motion For Contempt.

■ Mrs. Simpson's second point on appeal is that the trial court's denial of her Motion for Contempt against the Bucks for moving to Ohio without allowing her visitation on November 8, 1996, was against the weight of the evidence and constitutes an abuse of discretion on the particular facts of this case. We disagree.

Section 452.402, governing grandparent visitation, does not specifically provide a standard for determination of contempt of an order allowing grandparent visitation. Section 452.400.3, however, provides that a custodial parent shall comply with an order allowing visitation by the noncustodial parent and that:

In the event of noncompliance, the noncustodial parent may file a motion for contempt. Upon a finding by the court that its order for visitation has not been complied with, without good cause, the court shall define the noncustodial parent's visitation or temporary custody . . .

§ 452.400.3. Thus, the statute provides that contempt may be found in cases involving parental visitation rights only if the court finds that the order was not complied with, without good cause. This is consistent with the standard we applied in determining whether the court erred in denying a motion for contempt for denial of grandparent visitation in *Ellis*, 870 S.W.2d at 465–66. As we stated in that case, "[i]n child custody and visitation cases, courts are reluctant to impose the harsh sanction of contempt upon a parent absent a finding that disobedience of a court order is willful and intentional." *Id.* at 465. This is the standard which we apply here.

In deciding whether disobedience was willful and intentional, courts have looked to the particular facts of the case. The trial judge is in the best position to determine the intent with which the parties acted and we defer to its determination on this matter. *Gerau v. Gerau*, 927 S.W.2d 441 (Mo.App.1996). In this case, as stated above, all parties involved intended to prepare and execute a written settlement agreement before a judgment was entered. No agreement was ever formally executed by the parties. The proposed agreement, read into the record on August 28, 1996, by the Guardian Ad Litem, indicated that the parties agreed that most of the first year of visitation would be supervised. It was further agreed that two weeks notice and an itinerary would be given to the Bucks prior to any visitation. The November 1, 1996 judgment contained none of these provisions In addition, the trial court heard testimony that while the Bucks were told about the November 1, 1997 judgment prior to November 8, 1997, they were not served with

---

3. Mrs. Simpson attorney indicated in oral argument that the parties' relationship was so poor that a visit in Ohio at the Bucks' home was simply not workable. Nothing in the record supports the claim that such visits could not be workable or that if they are not, it is the fault of the Bucks. If such evidence developed after the record was made in this case, it could provide a basis for a motion to modify but cannot affect our decision on this appeal.

it. On these facts, we cannot say that the trial court's judgment that the Bucks' actions were not willful, intentional and in contempt of the court's orders was against the weight of the evidence or an abuse of discretion.

For these reasons, we affirm the judgment below on all grounds.

HANNA, P.J., and EDWIN H. SMITH, J., concur.