Sharon KEERAN, Respondent,

v.

Jessica N. MYERS and Larry W. Myers, Appellants,

and

Todd Eric Schlegel, Defendant.

No. 26790.

Missouri Court of Appeals, Southern District, Division Two.

Sept. 23, 2005.

James R. Sharp, Sharp & Bredesen, Springfield, MO, for Appellants.

John T. Kay, California, for Respondent.

ROBERT S. BARNEY, Judge.

Appellants Jessica Myers ("Mother") and Larry Myers ("Father")(collectively "Appellants") appeal the trial court's grant of grandparent visitation to Respondent Sharon Keeran ("Grandmother").[1]

1. Mother's oldest child, Hailli, was born on June 8, 1995. Her father, Todd Eric Schlegel, did not participate in the trial in this matter nor in this appeal. Hailli lives with Appellants in the family home along with Ryne Myers ("Ryne"), born August 5, 1997, the natural daughter of both Appellants.

In their first of two points on appeal, Appellants argue the trial court erred in allowing Grandmother to seek visitation with Ryne because amended section 452.402.1 precludes such an action *when the parents of the child are legally married to each other and are living together with the child.* Additionally, Appellants posit error in the trial court's application of the savings statutes, sections 1.170 and 1.180, which permitted Grandmother to proceed under section 452.402, RSMo 2000, the previous version of the grandparent visitation statute which did not contain the aforementioned italicized limitation.

In their second point on appeal, Appellants maintain the trial court's grant of grandparent visitation as to both children was in error because such an award was against the weight of the evidence. We affirm the judgment of the trial court.

■■■ Our review of the trial court's grant of grandparent visitation is pursuant to the standard set forth in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).[2] *Corley v. Corley,* 128 S.W.3d 521, 524 (Mo.App.2003). "The trial court's judgment will be affirmed on appeal unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.* "We grant deference to the trial court's factual determinations, but do not defer to the lower court on questions regarding the declaration or application of the law." *Tompkins v. Ford,* 135 S.W.3d 508, 509 (Mo.App.2004). "Much deference is given to a trial court's ability to determine witness credibility." *In re G.P.C.,* 28 S.W.3d

357, 366 (Mo.App.2000). "A trial court determines what portions of a witness's testimony to believe or disbelieve." *Id.* Absent an abuse of discretion, "[a]n appellate court defers to the trial court's assessment of what serves the best interest of the child in matters pertaining to visitation rights." *Corley,* 128 S.W.3d at 524. We will find an abuse of discretion "only when the trial court's decision 'is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.' " *In re C.D.G.,* 108 S.W.3d 669, 674 (Mo. App.2002) (quoting *Waisblum v. Waisblum,* 968 S.W.2d 753, 755 (Mo.App.1998)).

■■ In our review of Appellants' first point of trial court error, we observe the record shows that in April of 2002, when Grandmother filed her petition in the present matter, section 452.402.1, RSMo 2000, set out, in pertinent part:

1. The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary orders to enforce the decree. The court may grant grandparent visitation when:

\* \* \*

(3) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days[.]

Thereafter, section 452.402.1, RSMo Cum. Supp.2002, became effective.[3] It sets out that:

1. The court may grant reasonable visitation rights to the grandparents of the

---

Unless otherwise stated, all statutory references are to RSMo 2000. All Rule references are to Missouri Court Rules (2004).

2. *Murphy* interpreted what is now Rule 84.13(d).

3. Although the changes to section 452.402 which took effect in 2002 are termed to be an

"amendment," the statute was indeed repealed and replaced with the current version of that section. *See* Ninety–First General Assembly, Second Regular Session, Session Laws 2002, S.B. Nos. 923, 828, 876, 694 & 736, p. 903.

child and issue any necessary orders to enforce the decree. The court may grant grandparent visitation when:

\* \* \*

(4) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days. However, if the natural parents are legally married to each other and are living together with the child, a grandparent may not file for visitation pursuant to this subdivision.

In the present matter, it is undisputed that Ryne resides with Appellants, her "natural parents," who "are legally married to each other and living together with [her]." § 452.402.1(4), RSMo Cum.Supp. 2002.

When faced with Appellants' motion to dismiss Grandmother's claim as to Ryne, the trial court found Grandmother's cause of action was commenced under the version of section 452.402 in effect at the time she filed her petition for grandparent visitation and, as such, her cause of action was "fully saved and protected by [s]ections 1.170 and 1.180 ..." and was not subject to dismissal due to the 2002 statutory changes.[4] The trial court noted in its judgment that:

> [T]he 2002 amendment of [s]ection 452.402 contains no explicit repeal of right accorded prior to the amendment, whereby [s]ections 1.170 and 1.180 are presumed to be incorporated into the 2002 amendment. As such, [Grandmother's] cause of action properly proceeds under the statute under which it

was filed, and is protected from the subsequent [2002] amendment by the savings statute.

Appellants argue the trial court's application of the savings statute in the present matter was inappropriate because the 2002 changes to section 452.402.1 were wholly procedural and section 1.180 specifically provides that "all proceedings had after the repeal becomes effective are governed by procedural rules and laws then in effect...." According to Appellants, the 2002 version was procedural in nature in that the changes "affected the *timing* of Grandmother's action for visitation rights," i.e., Grandmother had to wait until the natural parents were involved in dissolution proceedings or not otherwise living together before she petitioned for visitation rights.

Grandmother, on the other hand, asserts the 2002 version of section 452.402 was not procedural, but was, in fact, substantive because it "declares certain circumstances under which a grandparent *may not file for visitation;*" accordingly, the savings statute was properly applied.

■ We agree with Grandmother. The distinction between substantive and procedural law is that substantive law relates to the rights and duties giving rise to the cause of action, while procedural law is the machinery used to effect the suit. *Wilkes v. Missouri Highway and Transp. Comm'n,* 762 S.W.2d 27, 28 (Mo. banc 1988). Substantive statutes take away or

---

4. Section 1.170 provides

The repeal of any statutory provision does not affect any act done or right accrued or established in any proceeding, suit or prosecution had or commenced in any civil case previous to the time when the repeal takes effect; but every such act, right and proceeding remains as valid and effectual as if the provisions so repealed had remained in force.

Section 1.180 provides

No action or plea pending at the time any statutory provisions are repealed shall be affected by the repeal; but the same shall proceed, in all respects, as if the statutory provisions had not been repealed, except that all proceedings had after the repeal becomes effective are governed by procedural rules and laws then in effect, insofar as they are applicable.

impair vested rights acquired under existing law, or create a new obligation or impose a new duty. *Id.* In the present matter, section 452.402.1, RSMo Cum. Supp.2002, effectively cut off Grandmother's right to sue and took away a right which she was granted under the 2000 version of that section, which was in effect at the time she filed her petition on April 15, 2002.

■ "Whenever the legislature repeals an existing statute, it is considered to have done so in contemplation of the general saving clauses above quoted; and unless the legislature specifically makes the repeal retroactive, it is presumed that those saving provisions are to be incorporated by reference with the same effect as if the repealing statute contained its own special saving clause." *Prot. Mut. Ins. Co. v. Kansas City,* 551 S.W.2d 909, 912 (Mo. App.1977). As such, the amendment was substantive in nature and the savings statutes, sections 1.170 and 1.180, were properly applied by the trial court. Point I is denied.

■ Appellants' second point on appeal asserts the trial court erred in finding that Appellants had unreasonably denied Grandmother visitation with the children for over ninety days. Specifically, Appellants maintain "there was no substantial evidence to support such a finding and the finding was against the weight of the evidence."

As previously related, on April 15, 2002, Grandmother, who is the children's maternal grandmother, filed a petition requesting grandparent visitation, alleging that Appellants had unreasonably denied her visitation with Hailli and Ryne since September 21, 2001. Based on her argument that she "and the children have a fully developed and long standing grandparent—grandchild relationship," Grandmother requested that in the best interests of the children she should be granted "specific, defined and enforceable visitation rights" with both Hailli and Ryne.

At the hearing on the motion, Grandmother, a former nurse who resides sixty or seventy miles from Appellants, testified she was employed by the Missouri Department of Corrections as a dispatcher and jailer and also was attending the Missouri Sheriff's Academy in order to obtain her commission as a deputy sheriff. Grandmother related she is an insulin dependent diabetic and has knee problems which prevent her from climbing stairs. Grandmother testified that prior to Ryne's birth, she spent a great deal of time with Hailli and "would see [Hailli] at least every weekend and have [Hailli] at least two weekends ... every month," as well as babysitting for Hailli as Mother needed. She stated that she often took Hailli shopping, took her to the movies, took her out to eat, took her to ride bicycles, and took her swimming. It was not until Ryne was two years old that Appellants allowed her to go places with Grandmother or to spend the night at Grandmother's house. Grandmother testified that she did not have to discipline the children "very often." Grandmother characterized her relationship with the children as "a good loving relationship ... [t]hey expressed their love to [her] and [she] expressed [her] love to them." Grandmother stated that she often sent the children "little 'thinking about you'" cards in the mail.

According to Grandmother, she has not seen the children since September 5 or 6, 2001. On that date, Grandmother observed that Hailli's face and head were red. As a result of a conversation with Hailli regarding the source of the injuries, Grandmother placed a hotline call to the

Division of Family Services ("DFS").[5] Grandmother testified that she was scheduled to have the children for the weekend following the hotline call. When she called Mother, Mother "picked up the phone and started screaming and yelling at [her], 'Don't ever call here again,' that nobody wanted to talk to [her] and that [Mother] would put a restraining order on [her] and [Grandmother] would never see nobody ever again, and [Mother] hung up." Grandmother has not seen the children since that time and has had cards she sent to the children through the mail returned to her.

Grandmother admitted that when Ryne was four years old she allowed Ryne to give her an insulin shot, in case Grandmother "were ever [to] become sick or anything like that." She went on to state that her diabetes affects her eyesight, but that she did not feel that it impaired her driving ability or other behavior.

Grandmother acknowledged she maintains a friendly relationship with a former inmate she met when she worked at the Missouri State Penitentiary. She stated she met Russell Cooper ("Cooper") when she was working as a nurse and she acknowledged he was in prison at that time for "15 to 20" years for rape. According to Grandmother, one time Cooper spoke with Hailli on the telephone when he called Grandmother from prison, but that other than that, the children had no contact with him. Grandmother stated that she had never visited Cooper's home, but that while he was incarcerated she and Hailli visited Cooper's mother to discuss a reference letter Grandmother was writing on his behalf. Grandmother also admitted to carrying a loaded handgun in her purse on occasion, but she insisted it was only for when she was traveling "[l]ate nights on the road. . . ."

Mother testified that she had no relationship with Grandmother as of the date of trial and that her relationship with her had always been "[v]ery bad. . . ." According to Mother, Grandmother told her that she suffered frequent blackouts as a result of her diabetes, that her eye sight was bad, and that she would often be confused about her surroundings following a blackout. Mother also stated that the cessation of visitation was in part because Grandmother "was allowing overnight visits with [the] children to a convicted rapist's home."

Mother also testified the children typically came home dirty and unkempt from Grandmother's house. She also related that Grandmother had attended only three activities in which Hailli participated and that she had never been to any of Ryne's school functions or other activities. She also stated both girls had told her that Grandmother had told them to kill Mother with Windex, kill their pets, and "perform sexual acts" in order to get Appellants arrested.

Further, Mother stated that for the last five years Grandmother had "always" carried a loaded handgun in her purse and that her purse was "not secured. It was a danger to the children." Mother admitted she halted Grandmother's visitation with the children on September 6, 2001, based in part, on Grandmother's hotline call. Mother also admitted she intercepted holiday cards that Grandmother mailed to the children and threw them away before the children could see them. According to Mother, the children are afraid of Grandmother and do not want to see her. Moth-

er testified that she would be opposed to Grandmother having any type of visitation with the children and, if the trial court ordered visitation, she would not comply with the trial court's order.

Father testified that he had a criminal record which included "one charge of felony burglary, one charge of felony stealing, and then there is a misdemeanor of passing a bad check." Father did not believe the children were adversely affected by their lack of contact with Grandmother. He stated it was a couple of days after Grandmother made the DFS hotline call that he and Mother decided to terminate Grandmother's visitation with the children. Father also admitted to removing mail from the mailbox sent by Grandmother to the children. Father stated that he was opposed to Grandmother having any type of visitation with the children.

Cheryl Ray ("Ray"), a DFS caseworker, stated she became involved with the family at issue after Grandmother's hotline call in September of 2001. She stated she investigated "some physical abuse by [Mother] on the girls and unsanitary living conditions." [6] Ray performed a home assessment and found the home to be sanitary. She reported that Hailli and Ryne "definitely showed a bond with [Mother];" that "[t]hey smiled at each other;" and, that "[t]hey hugged each other." As a result, she determined that she had no concerns about the family at that time and found the hotline call to be unsubstantiated.

Ray also related that DFS received a second hotline call regarding the family in October of that same year. The hotline call was made by Mother and she alleged, *inter alia*, the girls had "disclosed to their great-grandmother about some of the things [Grandmother] had told them to

do." More specifically, the girls disclosed that Grandmother had "told them to give the cats pills or to strangle them, to put Windex and other cleaning chemicals in their mom and dad's mouth to kill them, to break things so Mom and Dad would go to jail." The day after the hotline call Ray interviewed both of the girls separately. Ultimately, Ray determined the hotline call was unsubstantiated.

Daniel Milzell ("Milzell"), the children's guardian ad litem, recommended that "it would be in the best interest of the children to visit on a limited supervised basis with [Grandmother]." Mr. Milzell based this recommendation on his interviews with the children and all of the parties in this matter. He related that while the children had said that Grandmother told them to "put Windex in their mother's mouth," he, nevertheless, noted that based on the children's ages "they have some credibility problems."

In its "First Amended Judgment," the trial court found "that serious and unnatural issues exist between [Mother] and [Grandmother] which transcend the question of grandparent visitation ..." and that "this relationship, or the lack thereof, is the direct cause of the termination by [Appellants] of all contact between the children and [Grandmother]." Acknowledging "the many salutary benefits of the grandparent—grandchild relationship," the trial court found Appellants' reasons for terminating visitation were not credible and that their refusal to allow Grandmother contact with both children was "unreasonable and [was] detrimental to the best interests of the children." The trial court also set out that Appellants' "stated reasons for termination of contact by [Grand-

---

6. Specifically, the hotline call reported "[t]hat the house was unsanitary, there [was] cat feces on the floor, there was all kinds of junk on the floor, that there was a strong odor, that [Mother] had pulled the girls' hair, drug them by their hair."

mother] were pretextual. The primary factor was [Grandmother's] hotline call and the highly negative feelings of [Mother] toward [Grandmother]."

Furthermore, the trial court ordered that Grandmother was permitted visitation with the children "on the first calendar Sunday of each calendar month from noon until 4:00 p.m. . . . ." as well as on "December 22, 23 or 24 annually from noon until 5:00 p.m." [7]

As previously set out, section 452.402 governs grandparent visitation rights. "Grandparents are members of the extended family and society recognizes the important relationship between children and grandparents. In furtherance of this goal, the legislature adopted [s]ection 452.402, which contemplates occasional, temporary visitation by grandparents when found to be in the best interests of the child." *Simpson v. Buck,* 971 S.W.2d 856, 859 (Mo.App.1998); *see also Herndon v. Tuhey,* 857 S.W.2d 203, 209 (Mo. banc 1993). Section 452.402, provides, in part, "[t]he court shall determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair the child's emotional development. Visitation may only be ordered when the court finds such visitation to be in the best interests of the child." § 452.402.2. "A trial court has broad discretion in determining what limitations and terms of grandparent visitation are appropriate in a particular case." *Corley,* 128 S.W.3d at 524; *Simpson,* 971

S.W.2d at 859; *Herndon,* 857 S.W.2d. at 209. The proper standard for determining whether grandparent visitation should be ordered under section 452.402 is outlined in *Barker v. Barker,* 98 S.W.3d 532, 535–36 (Mo. banc 2003),

> the trial court was required to consider the parents' right to make decisions regarding their children's upbringing, determine the reasonableness of those decisions, and then balance the interests of the parents, child, and grandparents in determining whether grandparent visitation should be ordered pursuant to section 452.402. Although parental decisions are given material weight, the trial court may determine the reasonableness of those decisions based on the evidence. The court is not required to accept blindly a parent's reason for denying visitation.

The rights extended to grandparents, however, are not without limitation:

> Because the legislature set ninety days as a precondition, this is an indication to the courts that visitation should not be excessive, should not be on a par with parental visitation in custody matters, and should not necessarily be commensurate with the contact between the grandparents and grandchild prior to the deterioration of relations between the parties.

*Herndon,* 857 S.W.2d at 210.

Here, as in *Barker,* the trial court found that Appellants' "stated reasons for

7. The trial court also ordered that [Grandmother] have no contact with Russell Cooper during any visitation period with the children; that [Grandmother], when transporting the children, observe all state and local laws providing for child restrains [sic] and seat belting of the children; that [Grandmother] not allow the children access to any medication other than that prescribed by the children's physi-cian; that all firearms in [Grandmother's] possession, be they handgun or long gun, be unloaded and kept under lock when children are in her presence; that [Grandmother] not discuss with the children any of their parents in negative or disparaging terms; and that [Grandmother] shall not administer any corporal punishment in the discipline of the children.

termination of contact ... were pretextual. The primary factor was [Grandmother's] hotline call and the highly negative feelings of [Mother] toward [Grandmother]." *See Barker*, 98 S.W.3d at 535. The trial court went on to state that even though Mother testified that Grandmother was "a reckless and dangerous person and should not be around children," Mother "did not restrict or limit [Grandmother's] visitation until she learned of the hotline call in early September, 2001, after which she has refused to permit any contact between [Grandmother] and the children." Further, the trial court detailed testimony from Father that "he had not heard allegations of abuse or neglect of the children by [Grandmother] until a month after he terminated visitation." The trial court's ruling is "not a failure to give proper deference to the parents' wishes, but rather a finding that the parents did not honestly believe that restricted visitation was necessary because they did not impose such restrictions before the ..." 2001 hotline call which precipitated their denial of visitation. *Barker*, 98 S.W.3d at 536. "Where, as here, the trial court determines that the parents' explanation is not credible, the court may find the visitation denial unreasonable and grant grandparent visitation rights." *Id.* The trial court's findings are supported by the evidence. Point II is denied.

The judgment of the trial court is affirmed.

SHRUM, P.J., and BATES, C.J., concur.