**Jonathan Michael BRYAN, Appellant,**

v.

**Stephanie GARRISON, Respondent,**

and

**Debra Howard, Respondent.**

**No. WD 64888.**

Missouri Court of Appeals,
Western District.

April 11, 2006.

G. Thomas Harris, III, Richmond, MO, for appellant.

Stephanie Garrison, Lexington, MO, pro se.

Scott C. Hamilton, Lexington, MO, for Howard.

Before HARDWICK, P.J.,
BRECKENRIDGE and SPINDEN, JJ.

PATRICIA BRECKENRIDGE, Judge.

Jonathan Michael Bryan appeals the judgment of the trial court modifying the paternity judgment's provisions for visitation of his son, Jordin Matthew Bryan, with Debra Howard, Jordin's maternal grandmother. On appeal, Mr. Bryan claims the trial court erred in three respects. First, Mr. Bryan asserts that the trial court failed to make the requisite statutory findings in its modification judgment that visitation with Ms. Howard was in Jordin's best interests and that visitation with Ms. Howard would not endanger Jordin physically or emotionally. Second, Mr. Bryan contends the trial court erred because the visitation awarded to Ms. Howard in the modification judgment was excessive. Finally, Mr. Bryan claims the trial court erred because awarding unsupervised visitation to Ms. Howard was against the weight of the evidence. This court finds that the trial court made all necessary statutory findings and the trial court's judgment was supported by substantial evidence and was not against the weight of the evidence. Because the trial court's award of visitation to Jordin's maternal grandmother was excessive, the provisions in the trial court's judgment modifying visitation between Jordin and Ms. Howard are reversed, and the case is remanded to the trial court to enter a judgment with more restrictive visitation for Ms. Howard. The trial court's judgment is affirmed in all other respects.

## Factual and Procedural Background

Jordin was born to Stephanie Garrison on March 17, 2001. When Jordin was first born, he lived with his mother. After approximately a month, however, Ms. Howard and James Howard, Jordin's maternal step-grandfather, became Jordin's primary caregivers. After Jordin's birth, Mr. Bryan filed a petition for a determination of paternity and for custody and support. The trial court found Mr. Bryan to be Jordin's natural father, and entered a

judgment of custody and support on March 27, 2002. This judgment adopted a parenting plan submitted by Mr. Bryan and awarded Mr. Bryan sole legal and physical custody of Jordin. Mr. Bryan and Ms. Garrison have never been married. The judgment provided that Ms. Garrison would have visitation with Jordin "[e]very other weekend of each and every month from 6:00 P.M. Friday until 6:00 P.M. Sunday" and from 4:00 P.M. until 8:00 P.M. each Tuesday and Thursday evening. The judgment further provided that Ms. Garrison was to have visitation with Jordin for two weeks each summer and established a holiday visitation schedule. Ms. Garrison's visitation was to be supervised by her mother, Ms. Howard, or her step-father, Mr. Howard. The judgment stated that, if Ms. Garrison failed to exercise her visitation, Ms. Howard could exercise visitation with Jordin in her daughter's place.

On September 9, 2003, Mr. Bryan filed a motion to modify the trial court's judgment of March 27, 2002, by modifying the visitation arrangement. Specifically, Mr. Bryan alleged that Jordin had been sexually abused while in the care of the Howards. Because of the alleged abuse, Mr. Bryan's motion sought to modify visitation to protect Jordin's safety and welfare. Mr. Bryan also filed a motion seeking to terminate or restrict the visitation rights of Ms. Garrison and Ms. Howard, until such time as the court could determine their fitness to continue visitation. Both motions included a request for the court to appoint a guardian ad litem.

Ms. Howard filed an answer to Mr. Bryan's motion to modify, denying the allegations of abuse, and a countermotion to modify in which she requested "primary care, custody and control of" Jordin. In support of her countermotion, Ms. Howard alleged that awarding her custody of Jordin would be in Jordin's best interests because Mr. Bryan changed his residence frequently; failed to keep a safe, clean, and healthy home; made false accusations against her and her husband; and kept Jordin from seeing her and her husband with whom he had developed a bond. The countermotion further requested that Mr. Bryan's visitation with Jordin be supervised and that the court appoint a guardian ad litem. The trial court appointed a guardian ad litem.

At the end of the trial, the trial court found "no sufficient evidence" that Jordin had been abused "in any way." Nevertheless, the trial court found that, due to the fact that the Howards had recently moved to Colorado, a modification in visitation between Ms. Howard and Jordin was necessary. The trial court awarded Ms. Howard two separate two-week visitation periods during June, July and August of each year. In the trial court's findings, the court also awarded Ms. Howard two separate one-week periods of visitation in Colorado when Jordin is not in school.[1] Further, the trial court's order also provided that, whenever Ms. Howard is in the state of Missouri, she is entitled to see Jordin, provided she gives seven days notice to Mr. Bryan and the visitation does not interfere with Jordin's school plans or with holidays. The trial court did not change the terms of Ms. Garrison's visitation as set out in the Judgment of Paternity dated March 27, 2002. Consequently, the terms of visitation as originally set out in the March 27, 2002 judgment, including Ms.

---

1. In the portion of the judgment where the trial court made its orders, however, the trial court did not include these additional one-week visitation periods. This court will assume that the trial court intended to award Ms. Howard the two separate one-week periods of visitation and that the trial court could correct its scrivener's omission by a judgment nunc pro tunc.

Howard's right to visitation with Jordin in the event Ms. Garrison fails to exercise visitation, remain in full force and effect. Mr. Bryan filed this appeal.

### Standard of Review

A grandparent visitation case is governed by the same standard of review as in other court-tried civil cases, that is, *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). *Noakes v. Noakes,* 168 S.W.3d 589, 593 (Mo.App. W.D.2005). Thus, this court will affirm the trial court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Doynov v. Doynov,* 149 S.W.3d 917, 922 (Mo.App. W.D.2004). This court must "view the evidence, and inferences drawn therefrom, in the light most favorable to the trial court's judgment." *Patton v. Patton,* 973 S.W.2d 139, 145 (Mo.App. W.D.1998). To prevail on his claim, Mr. Bryan must overcome this court's presumption that the judgment of the trial court is in Jordin's best interest. *Id.* Where evidence on an issue is disputed, or where there is contradictory evidence, this court defers to the trial court's credibility determinations. *Doynov,* 149 S.W.3d at 922. This court grants the trial court's judgment greater deference in child custody cases than in other types of cases. *Id.*

### Findings Sufficient

In his first point on appeal, Mr. Bryan claims the trial court erred by failing to make findings required under section 452.402.2, RSMo 2000, Cum.Supp. 2005.[2] Specifically, Mr. Bryan claims the trial court erred in failing to determine whether visitation with Ms. Howard was in Jordin's best interests and whether visita-

tion with Ms. Howard would "endanger [Jordin's] physical health or impair [Jordin's] emotional development."

Ms. Howard intervened in the original paternity action. Under the terms of the parenting plan agreed to by the parties and adopted by the court, Ms. Howard was granted the right to supervise Ms. Garrison's visitation. In the event Ms. Garrison failed to exercise her right to visit Jordin, the original judgment awarded Ms. Howard visitation rights in Ms. Garrison's place. In his motion to modify, Mr. Bryan sought to modify Ms. Garrison and Ms. Howard's visitation rights, based on alleged sexual abuse during court-ordered visitation. While Mr. Bryan's motion to modify did not specify which party allegedly sexually abused Jordin, the evidence at trial was that the allegation of sexual abuse was against Mr. Howard.

While Mr. Bryan's motion to modify sought a modification of both Ms. Garrison and Ms. Howard's visitation, in his point on appeal, Mr. Bryan only asserts error regarding the trial court's modification with respect to Ms. Howard. Therefore, this court will consider Mr. Bryan's alleged error solely in terms of a modification of grandparent visitation.

In determining whether to initially award a grandparent visitation rights under section 452.402.2, Mr. Bryan correctly notes that the trial court is required to "determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair the child's emotional development." Moreover, "[v]isitation may only be ordered when the court finds such visitation to be in the best interests of the child." Section 452.402.2. Mr. Bryan's

---

**2.** All statutory references are to the Revised Statutes of Missouri 2000, Cum.Supp.2005, unless otherwise indicated.

motion to modify visitation, however, is not an initial determination of visitation rights. Rather, Mr. Bryan's motion seeks a modification of visitation. Therefore, this case is governed by the applicable standards for a modification of visitation. As this court held in *Noakes*, section 452.400 governs and under that section, *"modification* of grandparent visitation rights requires only a reasonable finding that such modification is in the child's best interests." 168 S.W.3d at 596.

In this case, the trial court specifically found:

6. Since the date of the Judgment of Paternity, there have been changed circumstances so substantial and continuing as to make the terms of said Judgment and Decree unreasonable regarding the health, safety, welfare and best interests of [Jordin].

7. As a result of said circumstances, a modification of the judgment is necessary to serve the best interests of [Jordin].

8. The Court finds that there is no sufficient evidence that [Mr. Howard] abused [Jordin] in any way.

9. The Court finds that there should be no restrictions on visitation with [Ms. Howard].

Thus, the trial court found that awarding Ms. Howard unsupervised visitation with Jordin was in Jordin's best interests. Moreover, in regard to Mr. Bryan's allegation that Mr. Howard sexually abused Jordin, the trial court specifically found that there was insufficient evidence to support this claim. Rather, the changed circumstance that the trial court found justified modification was the Howards moving to Colorado.

The trial court's findings under section 452.402.2 are sufficient. The trial court found that the modification was in Jordin's best interests as required by *Noakes*. 168 S.W.3d at 596. In addition, the trial court found insufficient evidence to support the allegations of abuse. The statute does not require more detailed findings. *Blakely v. Blakely*, 83 S.W.3d 537, 548 (Mo. banc 2002). Furthermore, Mr. Bryan failed to request more detailed findings from the trial court under Rule 73.01. *Id.* Consequently, this court finds that the trial court made all necessary findings. *Noakes*, 168 S.W.3d at 596. Mr. Bryan's first point is denied.

### Substantial Evidence Supports Judgment

■ For clarity of discussion, Mr. Bryan's third point is addressed out of order. In his third point on appeal, Mr. Bryan claims the trial court erred in allowing Ms. Howard to have unsupervised visitation with Jordin because the trial court's judgment was not supported by substantial evidence and was against the weight of the evidence. Mr. Bryan argues that the evidence in this case compels the conclusion that unsupervised visitation with Ms. Howard is contrary to Jordin's best interests because Mr. Howard abused Jordin. The trial court did not believe that Jordin was abused by Mr. Howard, however, and there is substantial evidence in the record to support the trial court's judgment.

At trial, Mr. Howard testified that he loved Jordin very much and had never abused Jordin. Similarly, Ms. Howard, Ms. Garrison, and Mr. Howard's brother, William Howard, all testified that Mr. Howard has never behaved inappropriately with Jordin. William [3] specifically testified

---

3. To avoid confusion, this court uses William Howard's first name to distinguish him from his brother, Jim Howard. In so doing, this court intends no disrespect.

that he was usually with Mr. Howard when Mr. Howard was looking after Jordin. William testified that he never witnessed Mr. Howard behaving inappropriately with Jordin, but did observe that Jordin sometimes cried when his diaper was changed.

The testimony of Mr. Howard, Ms. Howard, Ms. Garrison, and William is supported by the testimony of Celest Davis, the caseworker assigned by the Children's Division to investigate Mr. Bryan's claim of sexual abuse. In an attempt to determine whether Mr. Bryan's claim merited further investigation, Ms. Davis reviewed medical documents, consulted with the Lafayette County Sheriff's Department, and interviewed the Howards. Mr. Bryan would not cooperate with the investigation by making Jordin available to be interviewed by Ms. Davis.

In her investigation, Ms. Davis found that, while Mr. Bryan and his mother, Ms. McWilliams, reported that, upon returning from the July 2003 visitation with the Howards, Jordin had blisters on his penis and a distinct red ring around his anus, these statements were inconsistent with the findings of the doctors who examined Jordin at Children's Mercy Hospital. The doctors' examination did not reveal blisters on Jordin's penis, nor a distinct red ring around his anus. Rather, Jordin was diagnosed as suffering from "mild erythema on his scrotum and around his anus." This diagnosis is consistent with a skin irritation in the nature of diaper rash, which Jordin has suffered from frequently.[4] Ms. Davis found that the physical evidence was inconclusive as to sexual abuse. Ms. Davis ultimately concluded that the evidence did not merit further investigation. A letter to this effect was sent out to the Howards and Mr. Bryan. After sending the letter

with her conclusions, Ms. Davis was informed by her manager that Mr. Bryan had called the state or area office to complain that Ms. Davis had a conflict of interest because she was a close personal friend of the Howards. Ms. Davis had never met the Howards prior to the investigation.

Additionally, the trial court arranged a supervised visitation between Jordin and Mr. Howard. Jordin's half-brother, Dylon,[5] and his aunt also attended the visitation. The visitation was observed by Ms. Scarborough, one of Jordin's therapists, and Ms. Maycock, the guardian ad litem. Both Ms. Scarborough and Ms. Maycock testified that, while Jordin was initially reluctant to interact with Mr. Howard or Dylon, Jordin did not appear afraid of Mr. Howard. In fact, Ms. Maycock testified that, after this initial hesitation, Jordin demonstrated no apprehension toward Mr. Howard. Ms. Maycock testified that Jordin "would grab onto Mr. Howard's hand" and "ask [Mr. Howard] to carry him." Jordin's behavior during the supervised visitation did not indicate that he feared Mr. Howard.

Ms. Maycock also advised the court that she did not believe Jordin's best interests were served by denying visitation to Ms. Howard. Ms. Maycock recommended visitation be supervised at first. Ms. Maycock indicated, however, that her recommendation was made because of a concern that Jordin may associate trauma with Mr. Howard. Ms. Maycock did not believe that Jordin had been abused by Mr. Howard and questioned Mr. Bryan's decision to put Jordin in therapy nearly a year after the alleged abuse first occurred. Ms. Maycock doubted the ability of a child Jordin's age to remember abuse that oc-

---

4.  Jordin's diaper rash has been so severe at times that Jordin has been taken to the hospital.

5.  The Howards have also adopted and maintain custody of Jordin's half-brother, Dylon.

curred so long before therapy began. Ultimately, Ms. Maycock recommended that, provided the supervised "easing-in period" did not create any problems for Jordin, visitation with the Howards should continue unsupervised.

All of this is substantial evidence in support of and weighs in favor of the trial court's judgment. In support of his claim that the judgment was against the weight of the evidence, however, Mr. Bryan cites the diagnosis of Ms. Vernon and Ms. Scarborough, Jordin's therapists, that Jordin suffers from posttraumatic stress disorder caused by sexual abuse; the testimony from Mr. Howard's brother that he did not observe Jordin in pain because of diaper rash when changed by Mr. Howard; and testimony from family members that Jordin told them that "PapaJim hurt his butt."

Mr. Bryan first cites the findings and testimony of Ms. Vernon and Ms. Scarborough, as evidence that Jordin was sexually abused by Mr. Howard. Ms. Vernon, Ms. Scarborough's supervisor, testified that she believed Jordin suffered from posttraumatic stress disorder caused by sexual abuse. Ms. Vernon's opinion of abuse, however, was based largely on "behaviors described at home" by Mr. Bryan and Ms. McWilliams. These behaviors included Jordin's alleged fear of having his diaper changed, nightmares, inability to sleep, and fear of the Howards. All of these behaviors were described by Mr. Bryan or Ms. McWilliams, and have not been independently verified. Ms. Vernon admitted she had not spoken with Ms. Garrison or Ms. Howard.

Perhaps because of this, Ms. Vernon was unaware that Jordin's aggressive behavior did not begin until two to three months after Jordin's visitation with the Howards, when the abuse allegedly occurred. Ms. Vernon admitted that this information was important and could have resulted in a different diagnosis. Ms. Vernon was also unaware that the Howards were Jordin's primary caregivers for the first few months of Jordin's life, and that Jordin had been taken to the emergency room at least eleven times, and Ms. Vernon did not discuss Jordin's case with the Children's Division caseworker. Finally, the report from Ms. Vernon and Ms. Scarborough indicates that the therapists were told that the redness on Jordin's bottom had been witnessed over the course of several months. This conflicts with Ms. McWilliams' testimony at trial that the redness observed on Jordin following the July 2003 visit was substantially different from the rashes Jordin had previously experienced.

■ "The trial court is free to believe or to disbelieve any testimony, including an expert's." *Grissom v. Grissom*, 886 S.W.2d 47, 56 (Mo.App. W.D.1994). Here, while Ms. Vernon diagnosed Jordin as having posttraumatic stress disorder caused by sexual abuse, she had no opinion as to "what abuse took place." Ms. Vernon admitted an unstable environment, such as the one Jordin has experienced, i.e., going from Ms. Garrison's care to the care of the Howards, and then to Mr. Bryan and his family within the early months of his life, could result in many of the symptoms observed in Jordin. In making her diagnosis, Ms. Vernon never discussed the case with the Children's Division caseworker, the Howards, or Ms. Garrison. She also did not attend the arranged visitation between Jordin and Mr. Howard. Ms. Vernon also testified that much of the information that she relied on in making her diagnosis came from Mr. Bryan and Ms. McWilliams, and was not independently verified. As noted above, Ms. Vernon also testified that, in making her diagnosis, she was unaware of important information.

Consequently, substantial evidence supports a finding that Ms. Vernon's diagnosis that Jordin was sexually abused is not persuasive.

Ms. Scarborough's testimony was consistent with that of her supervisor, Ms. Vernon. As with Ms. Vernon, Ms. Scarborough relied heavily on information provided by Mr. Bryan and Ms. McWilliams. Additionally, as with Ms. Vernon, some of Ms. Scarborough's information was incomplete.[6] Ms. Scarborough had the opportunity to observe the supervised visit between Jordin and Mr. Howard. Ms. Scarborough testified that Jordin was initially reluctant to interact with Mr. Howard or Jordin's half-brother, Dylon. Ms. Scarborough testified, however, that, after approximately twenty to thirty minutes, Jordin began to interact with both his half-brother and Mr. Howard. Indeed, Ms. Scarborough testified that, after this initial "warming-up period," Jordin did not appear to be uncomfortable or fearful when interacting with Mr. Howard, and nothing in the supervised visitation indicated that Jordin was afraid of Mr. Howard. The trial court could have reasonably relied on Ms. Scarborough's failure to observe behaviors indicating that Jordin was fearful of Mr. Howard, and the biased and incomplete nature of some of the information relied on by both Ms. Vernon and Ms. Scarborough, in not being persuaded by their opinion that Jordin was sexually abused by Mr. Howard.

In addition to the diagnosis of Jordin's therapists, Mr. Bryan also presented evidence from William Howard, Mr. Howard's brother, that he is usually with Mr. Howard and Jordin during their visitation, and that he has never seen Jordin in pain from diaper rash when Mr. Howard changed him. William's testimony is apparently offered to counter the Howard's suggestion that Jordin's statement that "PapaJim" hurt him, may be in response to Mr. Howard applying medicine for diaper rash. William's actual testimony is as follows:

> [Ms. Maycock]: And did you ever see [Jordin] being in pain because of his diaper rash?
>
> [William]: No. He was crying a little bit when Jim would put another diaper on him.

Thus, while William responds in the negative to the question asking whether Jordin was in pain because of diaper rash, William does note that Jordin was in pain when his diaper was changed. Ms. Howard testified that Jordin had a history of painful diaper rashes. Regardless of the precise source, however, William's testimony established that Jordin experienced pain when having his diaper changed. William also testified that he has, at no time, witnessed Mr. Howard being inappropriate with Jordin. Thus, William's testimony tends to support trial court's judgment and does not undermine it as Mr. Bryan argues.

■ The remainder of the evidence advanced by Mr. Bryan was provided by Mr. Bryan, his mother, and his grandfather. Mr. Bryan's mother and grandfather testified that Jordin told them that "Papa Jim hurt his butt." Despite having numerous therapy sessions, however, Jordin has never repeated this statement to his therapists. Indeed, only Mr. Bryan's family members have heard Jordin be so specific about the alleged abuse. By contrast, the Howards, Ms. Garrison, and William insist that Mr. Howard has never behaved inappropriately with Jordin. This court defers to the credibility determinations made by

---

**6.** Ms. Scarborough testified that she knew there had been custody changes but did not know "that there was so many changes back and forth."

the trial court, as the trial court "is entitled to believe or disbelieve all, part, or none of the testimony of any witness." *McDaniel v. McDaniel*, 982 S.W.2d 729, 731 (Mo.App. E.D.1998). The trial court's finding that there was insufficient evidence to prove that Mr. Howard abused Jordin is supported by substantial evidence and is not against the weight of the evidence. Mr. Bryan's third point is denied.

### Award of Visitation to Ms. Howard Was Excessive

██ In his second point on appeal, Mr. Bryan claims the trial court erred by awarding Ms. Howard excessive visitation. Specifically, Mr. Bryan claims that section 452.402 does not contemplate visitation for a grandparent in amounts consistent with parental visitation. Rather, Mr. Bryan claims visitation awarded to a grandparent under section 452.402 must be minimally intrusive to the family. Mr. Bryan claims that, because the visitation awarded to Ms. Howard by the trial court was not minimally intrusive, the trial court erred.

In this case, Ms. Howard was permitted to intervene pursuant to section 452.402.1(1), which allows a grandparent to file a motion to modify the original decree of dissolution and seek visitation when the grandparent has been denied visitation. The version of section 452.402 in effect at the time of the judgment provided, in pertinent part:

1. The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary orders to enforce the decree. The court may grant grandparent visitation when:

(1) The parents of the child have filed for a dissolution of their marriage. A grandparent shall have the right to intervene in any dissolution action solely on the issue of visitation rights. Grandparents shall also have the right to file a motion to modify the original decree of dissolution to seek visitation rights when visitation has been denied to them . . . .

In *Herndon v. Tuhey*, section 452.402 was challenged as violating the United States Constitution. 857 S.W.2d 203 (Mo. banc 1993). There, the grandparents were awarded visitation for nine hours on the first and third Saturday of each month, to be followed, after three months, with a schedule of nine hours visitation on the first Saturday of each month and an overnight stay on the third weekend of each month. *Id.* at 206. Additionally, the grandparents were awarded five hours of visitation on or around Thanksgiving Day and five hours of visitation on December twenty-third for Christmas. *Id.* Finally, the grandparents were awarded two days of visitation during the child's Christmas vacation, with an overnight stay, and one week during summer vacation. *Id.* In addition to this scheduled visitation, the parents were required to inform the grandparents regarding activities in which the child was involved so the grandparents could attend. *Id.*

The parents challenged section 452.402, claiming they possessed a constitutional right to raise their children without intervention from the state. *Id.* at 207. They argued that, by forcing them to permit visitation with the grandparents, the statute violated their constitutional rights. *Id.* The Missouri Supreme Court disagreed, finding subsections 452.402.1(3) and 452.402.2 constitutional. *Id.* at 208. The Court found that "[e]ven given the fact that parents have a constitutional right to make decisions affecting the family, the magnitude of the infringement by the state is a significant consideration in determining whether a statute will be struck down as unconstitutional." *Id.* The Court found that subsections 452.402.1(3) and 452.402.2 did not require a substantial enough en-

croachment on the family to be unconstitutional. *Id.* at 209. Rather, the visitation contemplated by the statute was "occasional, temporary visitation, which may only be allowed if a trial court finds visitation to be in the best interest of the child and does not endanger the child's physical or emotional development." *Id.*

Nevertheless, the Court did find that the specific visitation awarded was excessive. *Id.* at 210. The Court "interpret[ed] the language of section 452.402, which requires as a prerequisite to ordering visitation an unreasonable denial of visitation for ninety days, to mean that visitation is to be much more limited than what was granted by the trial judge." *Id.* Further, the Court found "that visitation should not be excessive, should not be on a par with parental visitation in custody matters, and should not necessarily be commensurate with the contact between the grandparents and grandchild prior to the deterioration of relations between the parties." *Id.* The Court remanded the case to the trial court to reassess the visitation. *Id.* at 211.

Several years after *Herndon,* however, the United States Supreme Court held a Washington statute permitting grandparent visitation unconstitutional as applied by the Washington courts. *Troxel v. Granville,* 530 U.S. 57, 73, 120 S.Ct. 2054, 2064, 147 L.Ed.2d 49 (2000). The constitutionality of section 452.402 was subsequently challenged again in *Blakely v.*

*Blakely,* 83 S.W.3d 537 (Mo. banc 2002). The parents in *Blakely* claimed that, under the Supreme Court's decision in *Troxel,* section 452.402 was unconstitutional because it does not require a finding that lack of grandparent visitation will cause harm to the child. *Id.* at 543. The Court in *Blakely* determined *Troxel,* which found the Washington statute unconstitutional as applied, was based on the " 'breathtakingly broad' " wording of the statute, the trial court's failure to give deference to the parent's decision regarding visitation, and the trial court's failure to take into account the parent's willingness to permit limited visitation. 83 S.W.3d at 542-43 (quoting *Troxel,* 530 U.S. at 67, 71, 120 S.Ct. 2054).

The Court, in *Blakely,* found that the United States Supreme Court's concerns in *Troxel* were not applicable to section 452.402. 83 S.W.3d at 543–44. *Blakely* found that, under *Troxel,* "the constitutionality of any standard for awarding visitation should turn on the specific manner in which that standard was applied." 83 S.W.3d at 543. *Blakely* found critical distinctions between the Washington statute and section 452.402. First, section 452.402 is more limited in terms of who may seek visitation. *Id.* at 544. While the Washington statute permitted anyone to seek visitation, section 452.402 is limited to the child's grandparents. *Id.* Second, *Blakely* found that, under section 452.402.1(3)[7], a

---

**7.** The version of section 452.402 in effect at the time when *Blakely* was decided read:

"1. The court may grant reasonable visitation rights to the grandparents of the child and issue any necessary order to enforce the decree. The court may grant grandparent visitation when:

(1) The parent of the child have filed for a dissolution of their marriage. A grandparent shall have the right to intervene in any dissolution action solely on the issue of visitation rights. Grandparents shall also have the right to file a motion to modify the original decree of dissolution to seek visitation rights when such rights have been denied to them;

(2) One parent of the child is deceased and the surviving parent denied reasonable visitation rights;

(3) A grandparent is unreasonably denied visitation with the child for a period exceeding ninety days; or

(4) The child is adopted by a stepparent, another grandparent or other blood relative.

grandparent must be denied visitation entirely for a period of ninety days before the statute takes effect. *Id.* Under this standard, the grandparents in *Troxel* would not have been able to obtain a visitation order under section 452.402 because the parent in *Troxel* was willing to allow limited visitation. *Id.* at 545. Third, *Blakely* found that, unlike the Washington statute, section 452.402.1(3) places "the burden of proving that [the] denial of visitation was 'unreasonable'" on the grandparents. *Id.* Finally, *Blakely* found that section 452.402, "unlike the Washington statute, does not simply leave the best interests issue to the unfettered discretion of the trial judge." *Id.* Rather, section 452.402 provides for "procedural safeguards that assist the judge in making the best interests determination, including providing for a home study, for consultation with the child regarding his or her wishes, and for appointment of a guardian ad litem." *Id.*

*Blakely* "reaffirm[ed] the narrow interpretation of Missouri's statute adopted in *Herndon*." 83 S.W.3d at 544. The Court found that such an interpretation met the standard set out in *Troxel.* *Id.* In so doing, the *Blakely* court affirmed *Herndon's* holding "that the statute contemplates only *'occasional, temporary visitation,* which may only be allowed if a trial

court finds visitation to be in the best interest of the child and does not endanger the child's physical or emotional development.'" *Id.* at 543–44 (quoting *Herndon,* 857 S.W.2d at 209). Consequently, *Blakely* reiterated that section 452.402 "permitted only a *'minimal intrusion* on the family relationship.'" *Id.* at 544 (quoting *Herndon,* 857 S.W.2d at 210). Ultimately, the Court found that two hours of visitation every ninety days was not unconstitutionally excessive under the statute. *Id.* at 548.

Although *Herndon* and *Blakely* were construing the constitutionality of [section] 452.402.1(3) and not the remaining subsections of [section] 452.402.1, it is clear that the occasional, minimal restriction recognized by the *Herndon* court is necessary for all of section 452.402 to be constitutional.[8] *Hampton,* 17 S.W.3d at 604.[9] While recognizing that what may constitute a minimal intrusion will vary according to circumstances, the *Hampton* court noted that a parent does not lose the parent's fundamental right to direct the upbringing of [the parent's child] upon the dissolution of the parent's marriage. *Id.* at 605. *Hampton* concluded that visitation amounting to "more than a minimal intrusion on the family relationship" was "unconstitutional and prohibited." *Id.* (quoting *Komosa,* 939 S.W.2d at 482–83).

2. The court shall determine if the visitation by the grandparent would be in the child's best interest or if it would endanger the child's physical health or impair the child's emotional development. Visitation may only be ordered when the court finds such visitation to be in the best interests of the child. The court may order reasonable conditions or restrictions on grandparent visitation."

8. Section 452.402 has been amended since the *Herndon* decision. Nevertheless, the substance of the statute has not been changed so as to impact the Court's decisions in *Herndon* or *Blakely*.

9. Both *Herndon* and *Blakely* dealt with section 452.402.1(3). This court's Southern District has held that *Herndon's* constitutional analysis does not control section 452.402.1(1) or 452.402.1(2). *Whoberry v. Whoberry,* 977 S.W.2d 946, 950 (Mo.App. S.D.1996). Both this court's Western District and Eastern District, however, have held that the constitutional analysis of *Herndon* applies to section 452.402.1(1) and 452.402.1(2). *See, e.g. Hampton v. Hampton,* 17 S.W.3d 599 (Mo. App. W.D.2000); *Komosa v. Komosa,* 939 S.W.2d 479 (Mo.App. E.D.1997).

In *Hampton*, the father was awarded primary physical custody of the child, subject to the mother's right to reasonable visitation. 17 S.W.3d at 601. Specifically, the mother was awarded visitation on alternate weekends, alternate major holidays, and two two-week periods in the summer. *Id.* The father subsequently filed a motion to modify requesting that the mother's visitation be supervised, and requesting sole legal custody and modified physical custody. *Id.* One changed circumstance cited by the father was the mother's impending incarceration. *Id.* The maternal grandparents intervened. *Id.* The trial court's judgment awarded the father sole legal custody, but awarded grandparents visitation every other weekend from 6:00 P.M. on Friday until 6:00 P.M. on Sunday, while Mother was incarcerated. *Id.* The trial court further ordered that, after Mother was released, her visitation would be supervised. *Id.* On appeal, this court found that requiring visitation every other weekend from 6 P.M. on Friday to 6 P.M. on Sunday is not minimal. *Id.* Consequently, the court in *Hampton* reversed the judgment of the trial court as an unconstitutional application of section 452.402. *Id.*

This court agrees with the analysis set forth in *Hampton* that visitation awarded under section 452.402 must be minimally intrusive on the family to be constitutional. Here, the trial court awarded Ms. Howard "two (2) separate two (2) week periods during the summer months of June, July and August of each and every year." The trial court also found she should have two one-week periods of visitation when Jordin was not in school. Additionally, the trial court's judgment states "[t]hat on such occasions when [Ms. Howard] is in the State of Missouri she shall be allowed to have a visitation period with [Jordin] for so long as she provides [Mr. Bryan] seven (7) days advance notice and that said period of visitation shall not interfere with [Jordin's] school attendance nor holidays." Finally, the judgment states that the original provisions relating to visitation, as set out in the March 27, 2002 Judgment of Paternity remain in effect, so the judgment still provides that Ms. Howard may exercise visitation awarded to Ms. Garrison, if Ms. Garrison does not.

As with *Herndon* and *Hampton*, the visitation awarded here is not a minimal intrusion on the family relationship. *Herndon*, 857 S.W.2d at 210; *Hampton*, 17 S.W.3d at 605. Because this court finds the trial court misapplied the law by awarding excessive visitation, the provisions for visitation by Ms. Howard are reversed, and this case is remanded back to the trial court to award visitation consistent with Missouri law. While the circumstances of this case are that Ms. Howard has custody of Dylon, Jordin's half-brother, and was the primary caregiver of Jordin for six months, the visitation order must still be only occasional, temporary visitation that is not commensurate with parental visitation and is only a minimal intrusion on the family relationship. The trial court's award in this case was excessive. The judgment is affirmed in all other respects.

All concur.