DATE MODIFIED: MAY 30, 2023



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| MELISSA ALDRIDGE, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD85520 |
| | ) | |
| DEVIN MARTIN, | ) | Opinion filed: April 18, 2023 |
| | ) | |
| Appellant. | ) | |

**APPEAL FROM THE CIRCUIT COURT OF CLAY COUNTY, MISSOURI
THE HONORABLE ALISHA D. O'HARA, JUDGE**

Division Two: Edward R. Ardini, Jr., Presiding Judge,
Lisa White Hardwick, Judge and Karen King Mitchell, Judge

Devin Martin ("Father") appeals the judgment of the Circuit Court of Clay County awarding his mother, Melissa Aldridge ("Grandmother"), grandparent visitation rights to Father's son ("Child") under section 452.402, RSMo. Grandmother was awarded a 24-hour period of visitation every other weekend, as well as a "video chat" with Child once a week "for up to 30 minutes." Father does not contest that an award of visitation is in the best interests of Child, but asserts that the amount of visitation awarded to Grandmother is unlawfully excessive, and represents more than "a minimal intrusion of [his] relationship with [Child.]" We affirm the judgment of the trial court.

## Factual and Procedural Background

Child was born on July 12, 2018 to Father and Nicole Rainey ("Mother"), who were not married. In August 2021, Grandmother and her husband ("Step-Grandfather") filed a petition for grandparent visitation rights[1] pursuant to section 452.402.1(3), RSMo,[2] which provides that a court "may grant reasonable visitation rights" to a grandparent when the grandparent "has been unreasonably denied visitation for a period exceeding sixty days" and "[t]he child has resided in the grandparent's home for at least six months within the twenty-four month period immediately preceding the filing of the petition." "Visitation may only be ordered [if] the court finds such visitation to be in the best interests of the child." § 452.402.2.

The petition alleged that Father and Mother moved into Grandmother and Step-Grandfather's home with Child in March 2019, Mother moved out in April 2019, and Father moved out in October 2019, leaving Child in the care of Grandmother. The petition alleged that Child resided with Grandmother until May 2, 2021, when Father took Child. The petition also alleged that Father has not allowed Grandmother to see Child in person since May 9, 2021, and has not allowed any contact except for brief phone calls.

Father filed an answer alleging he left Child with Grandmother while he sought a home for him and Child to live in, and that when he attempted to "pick up" Child,

---

[1] The trial court dismissed Step-Grandfather's request for visitation rights because section 452.402 does not permit visitation awards to step-grandparents. *See Hampton v. Hampton*, 17 S.W.3d 599, 602 (Mo. App. W.D. 2000).

[2] All statutory references are to RSMo 2016 as currently supplemented.

Grandmother refused to allow him "to have the custody of" Child. He asserted he was assaulted when he attempted to take custody of Child, and he "was not able to regain custody of" Child from Grandmother and Step-Grandfather until May 2, 2021. Father requested the trial court dismiss Grandmother's petition for visitation rights. Mother did not file an answer to the petition.

The trial court conducted a hearing at which Father and Grandmother presented evidence. Mother did not appear at the hearing. Viewed in the light most favorable to the judgment,[3] the evidence was as follows.

Father, Mother, and Child moved into the home of Grandmother and Step-Grandfather because Father and Mother "did not have an income." The plan was for Father and Mother to "get jobs, get themselves together and then be able to proceed to take care of [Child]." At one point, Father and Mother got into a fight and Mother "pulled a . . . kitchen knife" on Father. Grandmother and Step-Grandfather installed security cameras in their home, and Mother "moved out pretty quick" after that, in April of 2019.

After Mother moved out, Father was "in and out." Father would leave "early in the morning and show up about nine o'clock after everybody was in bed," even when he was not working. Grandmother and Step-Grandfather "g[o]t into arguments with" Father about "him not being there, . . . coming and going, and not letting [them] know whether he would be there and not be there." They also argued with Father about his marijuana usage. During this time period, Grandmother and Step-Grandfather were the primary caretakers of Child.

---

[3] *Bryan v. Garrison*, 187 S.W.3d 900, 904 (Mo. App. W.D. 2006).

Father moved out of the home in September 2019. After he moved out, Father was "free to come and get [Child] and spend time with him," and Father could "take [Child] out any time," but Father did not do so frequently. In October 2019, Father came to the house, wanting to take Child trick-or-treating. However, Child was not feeling well, so Grandmother "asked that [Child] stay in." Father and Step-Grandfather began to argue, and Grandmother recorded the argument on her cell phone. When Father noticed she was recording, he "smacked the phone out of [Grandmother's] hand." In response, Grandmother "scratched [Father's] nose with [her] fingernail" in "defense."

After the Halloween incident, Father saw Child on Thanksgiving and Christmas of that year, "[a] few times" in January 2020, and on Father's Day 2020. Father did not otherwise see Child during that time period.

In June 2020, Grandmother "decide[d] to file for guardianship for [Child]" so that she could "ensure that [Child] had health insurance." Grandmother believed that without "legal custody" of Child, she would be unable to "put him on [her] health insurance." Grandmother contacted Father and Mother "about signing a consent for guardianship." Mother signed a "Consent to Appointment of Fiduciary" form, requesting Grandmother be appointed as guardian of Child because Mother was unable to care for him. Mother also signed an "Appointment of Standby Guardian" form purporting to allow Grandmother to have "care and custody and the right to provide medical care, education and any other services as she deems in [Child's] best interest." Father refused to sign any documents, and advised Grandmother that he was "not signing over any right as a parent" to her.

4

Grandmother filed a petition for guardianship of Child in June 2020.[4] After Father was served with the petition, he "show[ed] up at [Grandmother's] home unannounced in August[.]" Father stated "he was going to take [Child]." Grandmother told Father "he could come in and play and visit, but that he wasn't going to be removing [Child] from [their] home." Father left without Child.

Father became involved in the guardianship proceeding. After mediation, there was an agreement between him and Grandmother for Father to have "some kind of graduated visitation schedule." At first, Father visited Child in Grandmother's home. Eventually, Father and Child had visits outside of Grandmother's home. Father testified that, after discussions with his attorney and the guardian ad litem that had been appointed in the guardianship proceeding, Father learned that he (Father) had the "full right and ability" to "keep" Child. On May 2, 2021, Father "picked [Child] up for an extended time period" and did not bring him back. Father told Grandmother via text "that he was keeping [Child] and this was starting the transition into him having [Child] full time."

After that, Grandmother was permitted to see Child in person one time in May 2021 for "a short amount of time." Father allowed Grandmother to have "face time" calls with Child "[a] few times." The first time Grandmother and Step-Grandfather "face timed" with Child, he "cried the entire time . . . Meemaw, Meemaw, Pawpaw," which were the names Child called Grandmother and Step-Grandfather. At the time of the hearing in February

---

[4] Grandmother voluntarily dismissed her guardianship action in July 2021.

5

2022, the last contact Grandmother had been permitted to have with Child was "via [a] face time" call in October 2021.

Grandmother testified that she "really [doesn't] have much of [a relationship with Father]," though she had one previously "[w]hen it was convenient for him."

Father was asked at the hearing if Mother had contact with Child. Father testified that Mother "picks him up every other weekend if her job allows it," and that Mother "works weekends occasionally."

The trial court entered judgment finding that "it would be in the best interest of [Child] to have regular contact and reasonable visitation with his paternal grandmother." The trial court awarded Grandmother visitation with Child "from noon Saturday until noon Sunday on alternating weekends," and further ordered that Grandmother shall "have a video chat with the child each Wednesday at 6:00 PM for up to 30 minutes."

Father appeals, asserting in three points that the amount of visitation awarded Grandmother is unlawful because it constitutes more than a minimal intrusion on his relationship with Child. Specifically, Father asserts the award is on par with parental visitation (Point I), is excessive (Point II), and is commensurate with a level of visitation that existed prior to the deterioration of the relationship between Grandmother and Father (Point III).

**Standard of Review**

"A grandparent visitation case is governed by the same standard of review as in other court-tried civil cases[.]" *Bryan v. Garrison*, 187 S.W.3d 900, 904 (Mo. App. W.D. 2006). "Thus, this court will affirm the trial court's judgment unless there is no substantial

6

evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law." *Id.*; *see also Blakely v. Blakely*, 83 S.W.3d 537, 540 (Mo. banc 2002). We "view the evidence, and the inferences drawn therefrom, in the light most favorable to the trial court's judgment." *Bryan*, 187 S.W.3d at 904. Although we defer to the trial court's findings of fact, we "do not defer to the trial court on questions regarding the declaration or application of the law." *Clay v. Clay*, 552 S.W.3d 692, 695 (Mo. App. E.D. 2018).

When determining whether a visitation schedule is excessive, we "employ a case-by-case determination" based on the facts of the particular case before us. *Shemwell v. Arni*, 223 S.W.3d 216, 218 (Mo. App. W.D. 2007); *see also Ray v. Hannon*, 14 S.W.3d 270, 275 (Mo. App. W.D. 2000) ("[T]he particular facts of a case dictate the frequency with which visitation should be awarded," and "[o]ther facts may well require more frequent or flexible terms of visitation."), *overruled on other grounds*. The trial court "has broad discretion in determining what limitations and terms to grandparent visitation are appropriate in the particular case." *Clay*, 552 S.W.3d at 698.

**Analysis**

In three points, Father asserts that "the trial court misapplied the law by awarding Grandmother time that exceeded a minimal intrusion upon [his] parental rights." We disagree.

"Section 452.402 allows the court to grant reasonable visitation rights to the grandparents of the child" upon a finding that visitation with grandparents is in the child's best interests. *Shemwell*, 223 S.W.3d at 218 (internal marks omitted). The Missouri Supreme Court has upheld the constitutionality of section 452.402 "because [the statute]

7

contemplates only a minimal intrusion on the family relationship and because it is narrowly tailored to adequately protect the interests of parents and children." *Herndon v. Tuhey*, 857 S.W.2d 203, 210 (Mo. banc 1993). *See generally Troxel v. Granville*, 530 U.S. 57, 73 (2000) (holding Washington state grandparent visitation statute was unconstitutional as applied due to its "sweeping breadth"). In other words, the Missouri Supreme Court has found that section 452.402 is constitutional because it contemplates only limited or "occasional, temporary visitation." *Id.* at 209; *see also Blakely*, 83 S.W.3d at 548. The Court has provided guidance as to what type of award goes beyond limited visitation—*i.e.*, what visitation represents more than a minimal intrusion on the family relationship, stating "visitation should not be excessive, should not be on a par with parental visitation in custody matters, and should not necessarily be commensurate with the contact between the grandparents and grandchild prior to the deterioration of relations between the parties."[5] *Herndon*, 857 S.W.2d at 210. Because the "amount of time awarded to the grandparents is limited to a minimal intrusion on the family relationship[,]" "[a] visitation order that exceeds a minimal intrusion is unconstitutional and prohibited, requiring reversal." *Shemwell*, 223 S.W.3d at 218.

We find that the visitation awarded Grandmother here was sufficiently limited, and did not constitute more than a minimal intrusion on Father's relationship with Child.

---

[5] Father addresses each part of this quoted statement in a separate point on appeal. While we appreciate Father's attempt to avoid multifarious points relied on, we find the issue on appeal to be whether the visitation constituted more than a minimal intrusion upon Father's parental rights. Accordingly, we do not address Father's points separately.

Grandmother was awarded in-person visitation of essentially two days per month. The visitation schedule did not include any additional holiday time or extended time for vacation. A similar amount of in-person visitation was upheld by this Court where the grandmother was awarded one weekend per month from 9:00 a.m. Saturday to 6:00 p.m. Sunday, also essentially two days per month. *See Wills v. Wills*, 90 S.W.3d 126, 130 (Mo. App. W.D. 2002). Additionally, we find Grandmother's weekly "video chat" with Child to be minimally intrusive, as the chat must be under 30 minutes and can occur with Father present and participating. *See Clay*, 552 S.W.3d at 698 (finding a "monthly Skype session" was "minimally intrusive, as it could take place in Mother and Child's home, with no limitations on Mother's presence").

Although we acknowledge that some judgments awarding "alternating-weekends" visitation to grandparents have been reversed as too intrusive, the amounts of visitation time awarded in those cases were more extensive than what Grandmother received here. For example, in *Hampton v. Hampton*, we held that a grandparent visitation award of "every other weekend from 6 p.m. on Friday to 6 p.m. on Sunday" "exceeded a minimal intrusion." 17 S.W.3d 599, 605 (Mo. App. W.D. 2000). In that case, however, the in-person visitation award was essentially double what Grandmother received here, as the grandparents in *Hampton* received 48 hours of visitation every other weekend.[6] *See also T.W. ex rel. R.W. v. T.H.*, 393 S.W.3d 144, 147 (Mo. App. E.D. 2013) (grandparent

---

[6] Additionally, the grandparents in *Hampton* had never been the primary caregivers of the child, nor was there any indication that the grandparents had played more than the role of an ordinary grandparent in the child's life. As discussed more fully later in our analysis, such facts are relevant in determining what terms of grandparent visitation are appropriate.

visitation "on alternate weekends from 4:00 p.m. on Friday to 8:00 a.m. on Monday, alternating holidays, and time each Christmas Day" impermissibly impinged on the mother's constitutional rights, as it "place[d] the child with the maternal grandmother nearly twenty percent of the time, not counting the additional holiday time"); *Herndon*, 857 S.W.2d at 206, 210-11 (grandparents' visitation award was excessive where grandparents received: "the first Saturday of each month from 9:00 a.m. until 6:00 p.m. and an overnight visitation on the third weekend of each month from 1:00 p.m. on Saturday until 6:00 p.m. Sunday"; five hours of visitation on Thanksgiving or the Sunday after; five hours of visitation on December 23rd; "two consecutive days including an overnight stay during [the child's] Christmas vacation"; and "one week between June 15 and August 15", as well as required notification "of all school, social, and athletic activities in which [the child] is participating that grandparents would reasonably be expected to attend"). We find Grandmother's visitation to be less intrusive than these awards.

Moreover, "the particular facts of a case dictate the frequency with which visitation should be awarded," and one of the facts to be considered is the role that the grandparent has played in the child's life. *See Ray*, 14 S.W.3d at 275 (in finding that the visitation award was not excessive, we considered that the grandparents were the primary caregivers for the first three years of the child's life, and "were her only constant during those early years of development"); *Wills*, 90 S.W.3d at 130-31 (determining the visitation award was not excessive, and noting the grandmother "has had more than an ordinary grandparent role in the children's lives"); *see also Shemwell*, 223 S.W.3d at 218-19 (reversing visitation award as excessive and finding *Ray* distinguishable: "the grandparents in *Ray* were once the

10

primary caregivers for the grandchild during the first three years of her life because their daughter was unsuitable, and the Shemwells [(grandparents)] were never the primary caregivers for the boys").

Here, Grandmother was Child's primary caregiver for over two years because neither Father nor Mother was willing and able to take care of Child. During that time period, Father had infrequent, sporadic contact with Child, and Grandmother and Step-Grandfather were the only stable, constant caregivers in Child's life. Prior to Father taking Child and denying Grandmother visitation, she and Child had the close relationship of a parent and child. We find these circumstances weigh in favor of more frequent visitation for Grandmother. *See Simpson v. Buck*, 971 S.W.2d 856, 859 (Mo. App. W.D. 1998) (the particular facts of a grandparent visitation case "may well require more frequent or flexible terms of visitation"); *Clay*, 552 S.W.3d at 698 (in determining visitation was not excessive under the particular facts of the case, it was relevant that the grandmother "had relatively frequent contact with Child during the first 20 months of her life, and the relationship between the two was loving and close").

Father asserts that Grandmother's visitation award "was contrary to Missouri law" in that the award was impermissibly on par with parental visitation, citing *Siegenthaler v. Siegenthaler*, 761 S.W.2d 262 (Mo. App. E.D. 1988). Father contends that "*Siegenthaler* stands for the proposition that reasonable visitaiton [sic] to another parent should be at least two weekends per month," and the *Siegenthaler* "formula" is "inappropriate for grandparent visitation, which is not intended to equate with parental visitation."

11

But *Siegenthaler* does not establish a "formula" or "standard" for parental visitation, let alone establish a reasonable parental visitation standard of at least two weekends per month. In *Siegenthaler*, a father appealed a judgment awarding him parental visitation two weekends per month and certain alternating holidays, as well as the right to visit with his children "at all reasonable times upon reasonable notice to Wife." 761 S.W.2d at 266. On appeal, the Eastern District "believe[d] that the welfare of the children require[d] some other disposition," and awarded the father additional holiday and school break visitation. *Id.* Nowhere in *Siegenthaler* does the Eastern District describe a "reasonable" standard for parental visitation as Father here suggests. In fact, we have expressly rejected any such reading of the case. *See Peniston v. Peniston*, 161 S.W.3d 428, 431-32 (Mo. App. W.D. 2005) (rejecting the father's argument that, for an order of parental visitation to be reasonable, it must include visitation on at least alternating weekends under *Siegenthaler*, finding "the custody decision in *Siegenthaler* was not a determination of the 'minimally appropriate' visitation to be awarded"; rather, the outcome of *Siegenthaler* "was based upon the determination that, upon the particular facts of the case, the welfare of the children required a disposition different from the one entered by the trial court"). In sum, *Siegenthaler* does not support Father's argument that Grandmother's visitation was impermissibly on par with parental visitation.

In claiming that Grandmother's visitation is equivalent to parental visitation, Father also argues that "Grandmother's visitation has been put upon a level with Mother's visitation, in fact, Grandmother's visitation occurs more often than Mother's visitation does, as Mother does not have a dedicated weekly evening for a Facetime Call with the

12

Child." However, there is nothing in the record to suggest that Mother cannot have more frequent contact with Child.[7] As Father points out in his brief, Mother and Father voluntarily determined their custody and visitation arrangement without any governmental intervention. There is no court-ordered visitation award or parenting plan limiting Mother's visitation to alternating weekends, or keeping her from having phone calls with Child. If Grandmother's visitation award permits her to have equal or more visitation time with Child compared to Mother, it is because Mother has not arranged—or apparently sought— to have more frequent contact. This is no basis to deny Grandmother the limited visitation awarded to her by the trial court.

For the reasons described above, we find Grandmother's award was not impermissibly on par with parental visitation or excessive. Nor was the visitation awarded commensurate with the contact Grandmother had with Child prior to the deterioration of Grandmother and Father's relationship. Prior to their relationship souring, Father had moved in to Grandmother's home with Child, and Grandmother lived with Child full time. The visitation award provided for drastically less contact between Child and Grandmother than they enjoyed before Father took Child and denied Grandmother visitation.

Points I, II, and III are denied.

---

[7] Mother has never participated in this action or otherwise contested Grandmother's visitation. As such, the scant evidence regarding Mother's visitation with Child was Father's testimony at the hearing that Mother "picks [Child] up every other weekend if her job allows it" and Mother "works weekends occasionally." Father did not specify how much time Mother spends with Child on the weekends when she "picks him up," or state whether Child stays with Mother overnight.

13

## Conclusion

The judgment of the trial court is affirmed.[8]

_____

EDWARD R. ARDINI, JR., JUDGE

All concur.

---

[8] Pending before the Court are Grandmother's motions to strike Father's brief and dismiss his appeal for failure to comply with Rule 84.04. The motions are denied.